**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARIA N. GRACIA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 11-cv-07604 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| SIGMATRON INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Maria N. Gracia brought this suit against Sigmatron International, Inc., alleging workplace discrimination and a hostile work environment on the basis of gender and national origin (Count One) and retaliation (Count Two) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*[1] R. 1, Compl. ¶¶ 19-32.[2] Sigmatron moves for summary judgment on all claims. R. 40. For the reasons that follow, Sigmatron's motion is granted in part and denied in part.

**I. Background**

In deciding this summary judgment motion, the Court views the evidence in the light most favorable to the non-movant, Gracia. Maria Gracia is a female United States citizen of Mexican-American heritage. R. 50-1, Pl.'s Exh. 1, Gracia Decl. ¶ 2. Gracia

---

[1]The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

[2]Citation to the docket is "R." followed by the docket entry. Citations to the parties' Local Rule 56.1 Statements of Fact are "DSOF" (for Sigmatron's Statement of Facts) [R. 42], "Pl.'s Resp. DSOF" (for Gracia's response to Sigmatron's Statement of Facts) [R. 47], "PSAF" (for Gracia's Statement of Additional Facts) [R. 47; R. 48-2], "Def.'s Resp. PSAF"(for Sigmatron's response to Gracia's Additional Facts) [R. 76], and "Def.'s Reply DSOF" (for Sigmatron's reply to Gracia's response) [R. 77], followed by the paragraph number.

was an "assembly supervisor" at Sigmatron's Elk Grove Village plant from March 27, 2006 to December 5, 2008.[3] *Id.* ¶ 3; DSOF ¶¶ 6, 27; PSAF ¶ 11. Sigmatron is a company that manufactures components for electronics used in a variety of industries, including the life sciences, automotive, and telecommunications industries. DSOF ¶ 1.

As an assembly supervisor, Gracia was responsible for producing assemblies, which required her to supervise the output and quality of printed circuit boards, schedule assembly lines and product flow, and hire assembly-line workers. *Id.* ¶ 7. She was also responsible for training assembly workers to assemble circuit boards, which included teaching them to solder and distinguish between types of solders. *Id.* ¶ 12. To accomplish these duties, Gracia had the authority to stop production due to quality concerns, discipline workers, and reassign assembly workers to meet business demand. *Id.* ¶ 8.

In Sigmatron's view, Gracia was not a good employee. Between April 2008 and July 2008, Gracia was late to work 90% of the time. *Id.* ¶ 13. On July 21, 2008, Greg Fairhead (Sigmatron's Executive Vice President and Director of Operations) and Patrick Silverman (Gracia's plant manager) met with Gracia and warned her that she would be subject to further disciplinary action if her tardiness continued. *Id.* ¶¶ 2-4, 13. Despite this meeting, Gracia was late to work 20 more times during the next three months. *Id.* ¶ 14. Eventually, on October 15, Gracia was suspended for two days without pay and told that if she missed any scheduled time in the next 90 days, her

---

[3]Gracia actually began working for Sigmatron in 1999 as a temporary employee, but was promoted to assembly supervisor on March 27, 2006. Pl.'s Resp. DSOF ¶¶ 5-6.

employment would be immediately terminated. *Id.* ¶ 15. One week later, Gracia was warned for taking excessive breaks. *Id.* ¶ 16. The week after that, Gracia was reprimanded for failing to display required visual aids and customer instructions during an important plant tour by a potential Sigmatron customer. *Id.* ¶ 17. And that same day, she was also reprimanded for taking ten minutes longer for her lunch break than she was allowed. *Id.* ¶ 18. Finally, on December 5, 2008, Gracia was fired. *Id.* ¶ 27.

Sigmatron claims that on December 4 (the day before Gracia was fired), Eduardo Trujillo, a fellow supervisor at the plant, saw that Gracia's assembly workers were intentionally failing to follow customer specifications for the assembly of circuit boards. *Id.* ¶ 19; R. 78-9, Def.'s Exh. 16, Trujillo Dep. 30:15. Specifically, according to Sigmatron, Trujillo saw Gracia's assembly workers using RoHS ("Reduction of Hazardous Substances," or lead-free) solder on a circuit board that required leaded solder. R. 78-6, Def.'s Exh. 12, Gracia Dep. 71:23-72:1; R. 78-2, Def.'s Exh. 2, Fairhead Dep. 47:21-22. Trujillo approached Gracia and told her that she was allowing products to be soldered incorrectly. DSOF ¶ 20. Instead of intervening to stop the soldering, Gracia told Trujillo, "I have done this many times before and nobody ever found out." R. 41-15, Def.'s Exh. 15 at SMT-GRACIA0097 (Fairhead Memo). According to Sigmatron, Trujillo immediately told Silverman, who confirmed that Gracia's workers were using lead-free instead of leaded solder, stopped production, segregated the misassembled product, and informed Fairhead. DSOF ¶¶ 21-22. The next day, after various meetings with Trujillo and other assembly line personnel, Fairhead and

Sandra Miedema (the corporate HR manager) met with Gracia. R. 78-4, Def.'s Exh. 3, Miedema Dep. 13:16-20; DSOF ¶¶ 23-25. In that meeting, Gracia admitted that her workers had been mixing solders, which she knew from her training was unacceptable. *Id.* ¶ 25. After that meeting, Sigmatron says, Fairhead fired Gracia because of her failure to direct her production workers to adhere to customer specifications and her unprofessional attitude toward her job responsibilities. *Id.* ¶ 27.

Gracia has a different view of what happened, particularly on what caused her performance issues. Gracia does not dispute that she had problems with attendance and tardiness, *see* Pl.'s Resp. DSOF ¶¶ 13-17, but she alleges that her problems were caused by sexual and national-origin harassment from her supervisor, Silverman, *see* Gracia Decl. ¶¶ 20-21. She alleges that Silverman, beginning in June 2007, sent her harassing emails. In June, Silverman forwarded Gracia an email proposing that the United States cut down on gasoline usage by sending all illegal immigrants to fight in Iraq. PSAF ¶ 7; *see also* R. 41-24, Def.'s Exh. 24 at SMT-GRACIA0240. In August, Trujillo forwarded Gracia an email from Silverman (subject line: "Yep, I passed it on") which was critical of Mexican immigrants and contained several attachments, including (1) a picture of a mariachi band in a baseball stadium with the caption "Jose canoe si" instead of the correct opening lyrics ("Oh say can you see") to the "Star Spangled Banner" and (2) a map of North America where Mexico is labeled as "Yours" and the United States is labeled as "Not Yours." PSAF ¶ 4; Gracia Decl. ¶ 8; *see also* R. 58-1-60-1, Pl.'s Exh. E. In September, Silverman sent Gracia an email entitled "Original Homeland Security" that said, "Ask the American Indians what happens

4

when you don't control immigration." PSAF ¶ 3; *see also* R. 51-1, Pl.'s Exh. A. In November, Silverman sent Gracia three more emails, this time ridiculing women: (1) a picture taken from behind a woman with bare buttocks towing two cases of beer behind her (subject line: "Redneck Tractor Pull"); (2) an altered photograph of a smiling woman in a bikini with outlandishly enlarged breasts (subject line: "Do these sunglasses make my face look fat?"); and (3) an altered photograph of a topless woman lying face-down on a beach chair with her enlarged breasts protruding through the chair (subject line: "Best Beach Photo"). PSAF ¶ 3; *see also* R. 52-1, Pl.'s Exh. B; R. 53-1, Pl.'s Exh. C; R. 54-1, Pl.'s Exh. D. Finally, in April 2008, Silverman sent Gracia a photograph of Gracia's sister holding a baby; the face of a former plant employee is superimposed over the baby's face and the photograph is captioned "Mama . . . leche por favor!" ("Mama . . . milk please!"). PSAF ¶ 6; *see also* R. 55-1, Pl.'s Exh. F.

Gracia also alleges that Silverman pursued a romantic relationship with her. She alleges that he repeatedly called and texted her in the evening and late at night, asking to spend the night at her Chicago apartment after he attended a Cubs game (so that he did not have to drive back to the suburbs after the game) or asking her to meet up with him. PSAF ¶¶ 8, 17, 33. Around her birthday in August 2008, Silverman invited her to dinner and a movie with him. *Id.* ¶ 9. Silverman also brought pastries for people at the plant to celebrate Valentine's Day and Sweetest Day, but would single her out specifically for a pastry or a greeting card. *Id.* ¶¶ 10, 12. Once, when Sigmatron participated in an annual trade show, Silverman directed Gracia to ride to the show in his car but directed other employees to drive in separate vehicles. *Id.* ¶ 11. And

another time, while Gracia was standing on the production floor, Silverman pulled the collar of her turtleneck sweater down to expose her neck. *Id.* ¶ 13. Gracia alleges that she complained to Executive VP Fairhead and HR Manager Miedema, but they did not treat her complaints of harassment seriously. *See* PSAF ¶¶ 14-20, 23-24. She became increasingly anxious about Silverman's conduct because she feared that he could fire her, which caused her to be late to work in order to avoid Silverman as much as possible. *Id.* ¶¶ 21-22.

Of the solder incident that led to her firing, Gracia denies mixing solder types or causing any serious problems for Sigmatron by allowing an assembly employee to use lead-free solder on a leaded circuit board. PSAF ¶ 28. She claims that mixing solder was a minor error that occurred regularly without resulting in discipline or termination. Gracia Decl. ¶ 43. And she says that once Trujillo told her that one of her workers was using lead-free instead of leaded solder, she immediately stopped the employee from soldering and gave the employee lead-free circuit boards to work on. *Id.* ¶ 48. Instead, Gracia believes that Sigmatron fired her in retaliation for filing a charge of discrimination and harassment with the United States Equal Employment Opportunity Commission (EEOC). R. 48-1, Pl.'s Resp. at 15-19. According to Gracia, Fairhead received notice of her EEOC charge after she filed it on December 1, 2008. *See* R. 1 at 7; PSAF ¶ 32. Only a few days later, on December 5, Fairhead fired her. DSOF ¶ 27.

Ultimately, Gracia filed this lawsuit after receiving a right-to-sue letter from the EEOC. R. 1 at 8. Following discovery, Sigmatron has filed this motion for summary judgment. R. 40.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Centr., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008).

## III. Analysis

As a threshold matter, not all of the claims in the original complaint remain in the case. Although Gracia's complaint alleges (1) gender and national-origin discrimination, (2) a hostile work environment caused by gender and national-origin harassment, and (3) retaliation, *see* Compl. ¶¶ 19-32, Gracia backed away from her non-hostile-environment discrimination claims in her response brief. *See* Pl.'s Resp. at 17 (stating that "supposed claims of disparate treatment discrimination on grounds of her sex and national origin" have "never been part of this case"). And after Sigmatron pointed this waiver out in its reply brief, *see* R. 78, Def.'s Reply at 3, Gracia never

7

contested that argument in her sur-reply brief, *see generally* R. 82. Thus, Gracia's discrimination claims are waived and considered abandoned. *See, e.g.*, *United States v. Kennedy*, 726 F.3d 968, 975 (7th Cir. 2013) ("Waiver is the intentional relinquishment or abandonment of a known right . . . ."). The only live claims now are Gracia's hostile work environment (caused by gender and national-origin harassment) and retaliation claims.

## A. Hostile Work Environment

One of the ways in which employers may violate Title VII's prohibition against sex or national-origin discrimination in the terms and conditions of employment is by permitting harassment on the basis of gender or national origin "that is sufficiently severe or pervasive" to create an abusive working environment. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Under Title VII, to survive summary judgment on her hostile work environment claims, Gracia must (1) produce evidence that the alleged harassment was severe or pervasive, (2) show that the hostile conditions were because of her gender and national origin, and (3) present a basis for employer liability. *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013). Contrary to what Sigmatron believes, the harassing conduct does *not* need to be *both* severe and pervasive. *Id.* In fact, one instance of conduct that is sufficiently severe may be enough. *See Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999) (collecting Supreme Court cases). Conversely, conduct that is not particularly severe individually but is an incessant part of the workplace environment may be pervasive enough to subject the employer to

liability. *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). Ultimately, the key question is whether the conduct was so severe or pervasive as to alter the terms or conditions of the employment relationship. *Id.* (citation omitted).

In order to decide whether Gracia's showing meets this standard, the Court must examine all of the circumstances surrounding the alleged harassment, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 902 (7th Cir. 2005) (internal quotation marks and citation omitted). This examination comprises both an objective and subjective inquiry—put differently, the alleged harassment must have been objectively severe or pervasive, and Gracia must have subjectively believed that the alleged harassment was severe or pervasive. *See Jackson*, 474 F.3d at 499 (citation omitted).

### 1. Sexual Harassment

#### a. Severity or Pervasiveness

Gracia complains that Silverman subjected her to unwanted romantic advances. During the summer of 2008, she alleges that he "often" asked to stay the night at her house in Chicago after he attended Cubs games in the city because her house was closer to work than going to Silverman's home. Gracia Dep. 117:12-17, 119:1-3; Gracia Decl. ¶ 13.[4] Silverman also called and sent her late-night text messages "more than

---

[4]Although Sigmatron asserts that self-serving affidavits cannot create an issue of fact, *see, e.g.*, Def.'s Resp. PSAF ¶ 28, that statement is wrong: "[A] self-serving affidavit supported

once" (or "frequently"), inviting her to go out with him, eat dinner with him, or meet up with him. Gracia Dep. 119:13-22, 120:1-3; Gracia Decl. ¶ 13. This includes a September 2008 incident where Silverman called Gracia to invite her to a supplier party but later blamed it on a former Sigmatron employee who supposedly used his phone without his knowledge. R. 78-8, Def.'s Exh. 13, Silverman Dep. 43:22-48:12; Gracia Dep. 101:3-20; Gracia Decl. ¶ 31. Silverman also left her late-night voicemails while drunk "more than once," asking her to call him back. Gracia Dep. 120:24-121:15. In August 2008, Silverman repeatedly (two or three times) told her he wanted to take her out to dinner and a movie for her birthday. Gracia Dep. 119:6-12; Gracia Decl. ¶ 14. And Silverman would "a lot of times" bring in pastries for others, but call her into his office to give her a different pastry just for her. Gracia Dep. 104:23-105:2; Gracia Decl. ¶ 18. There were also one-off incidents. For example, Silverman gave her a greeting card for Sweetest Day in October 2007. Gracia Decl. ¶ 15. Once, Silverman insisted that Gracia ride to a trade show in his car but made other employees travel to the show separately. Gracia Dep. 147:21-148:24; Gracia Decl. ¶ 17. And on the factory floor, Silverman once asked her whether she was hiding bite marks under her turtleneck sweater and pulled down the collar of her sweater to reveal her neck. Gracia Dep. 115:11-116:22; Trujillo Dep. 27:13-28:5; Gracia Decl. ¶ 16.

---

by facts in the record could defeat summary judgment," *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004); *see also Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) ("As we have repeatedly emphasized over the past decade, the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment."). So the Court rejects Sigmatron's attack on Gracia's declaration on that basis, and Sigmatron does not otherwise provide a specific explanation for how the declaration is unsupported by the record.

Gracia also alleges that Silverman targeted her in cyberspace rather than just in person. Silverman, beginning in November 2007, sent Gracia several offensive emails depicting partially naked women: (1) the "Redneck Tractor Pull" email, which is a picture showing a woman with bare buttocks towing two cases of beer in front of a crowd of onlookers, Pl.'s Exh. B; (2) the "Sunglasses" email, which is an altered photograph of a smiling woman in a bikini with outlandishly enlarged breasts, Pl.'s Exh. C; and (3) the "Best Beach Photo" email, which is a similarly altered photograph of a topless woman lying face-down on a beach chair with her grotesquely enlarged breasts protruding through the chair, Pl.'s Exh. D. And in April 2008, Silverman sent her a photograph of Gracia's sister holding a baby; the face of a former plant employee is superimposed over the baby's face and the photograph is captioned "Mama . . . leche por favor!" ("Mama . . . milk please!"). Pl.'s Exh. F. On three of these emails, Gracia was the only recipient; on the other email, she was one of two recipients. *See* Pl.'s Exhs. B-D, F. According to Gracia, then, not only did Silverman send her these emails demeaning women (including her own sister), but he targeted her specifically.

Sigmatron asserts that the emails Silverman sent Gracia are outside the 300-day limitations period, so the Court may not consider them. R. 41, Def.'s Br. at 13. Under Title VII, an employee has 300 days from the occurrence of an allegedly discriminatory act in which to file a timely charge with the EEOC. 42 U.S.C. § 2000e-5(e)(1); *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir. 1999). Generally, a plaintiff is only allowed to base a Title VII suit on conduct occurring within the limitations period. *Hardin*, 167 F.3d at 344 (citation omitted). Here, the

11

EEOC charge was filed on December 1, 2008, *see* R. 1 at 7, meaning that any alleged discrimination occurring before February 2008 (which includes the first three emails) would generally be time-barred from consideration. But there is an exception to this rule: under the "continuing violation" doctrine, plaintiffs who can show that there has been a pattern of discrimination beginning outside the 300-day period and continuing into the 300-day period may reach back to the untimely acts and base liability on them. *Hardin*, 167 F.3d at 344. Here, Gracia has alleged that Silverman began to harass her by calling and texting her to meet up with him at night, asking to stay at her house, singling her out for treats, directing her to ride to a trade show with him, pulling down her sweater collar without her permission, and sending her lewd emails. This alleged behavior occurred both inside and outside the 300-day period. And this alleged behavior was all part of a single pattern of unwanted advances; it is not the case that (as Sigmatron argues, *see* Def.'s Reply at 9 n.9) the emails were acts of harassment wholly separate from Silverman's invitations and advances. In other words, Gracia has alleged that Silverman's general *modus operandi* of making advances *included* sending lewd emails. Finally, although the continuing violation doctrine does not apply if the employee should have reasonably perceived her working conditions as intolerable—and brought an EEOC charge at that point—before the 300-day period, *DeClue v. Cent. Ill. Light Co.*, 223 F.3d 434, 435 (7th Cir. 2000) (citations omitted), a large part of the alleged behavior here did not occur until after the 300-day clock began ticking. Gracia could not have reasonably brought a hostile work environment claim before February 2008 (which is before Silverman began asking Gracia to stay overnight at her house,

12

calling and texting her late at night to meet up, and inviting her on dates), so this exception-to-the-exception does not apply. Under the continuing violation doctrine, then, the Court can, and will, consider any alleged harassment that occurred before February 2008.

Now that the Court has identified all of the instances of alleged harassment, the question is whether they were objectively severe *or* pervasive.[5] *Hall*, 713 F.3d at 330. Taking the second possibility first, Gracia herself has left the pervasiveness of the alleged harassment unclear. It appears that the alleged harassment began as early as November 2007 (when Silverman sent the "Redneck Tractor Pull" email, *see* Pl.'s Exh. B) and lasted until September 2008 (when Silverman allegedly called her from the supplier party, *see* Gracia Decl. ¶ 31). Over those ten or eleven months, Gracia has not identified, even generally, how often Silverman harassed her. Gracia is certain that Silverman sent her four emails that were derogatory toward women, pulled down her turtleneck once, made her ride with him to a trade show once, and called her from a supplier party once, but she is murky on how often he asked her to meet up at night or stay overnight at her house and how often he gave her pastries. *See, e.g.*, Gracia Dep. 104:23-105:5 (testifying that Silverman gave her pastries "a lot of times"); *id.* 119:18-22 (testifying that Silverman sent her late-night texts "more than once"); *id.* 120:24-121:5 (testifying that Silverman called her while intoxicated "more than once"). And her declaration, created after her deposition, does not fill in the blanks; she only

_____

[5]The parties agree that Gracia subjectively felt harassed. *See generally* Def.'s Br.

avers that she "frequently" or "often" received unwanted telephone calls and text messages, that Silverman "repeatedly" told her to go on a date with him for her birthday, and that he "sometimes" gave her pastries individually. Gracia Decl. ¶¶ 13-14, 18. From this evidence—which is entirely within Gracia's knowledge—the Court cannot pin down exactly how often this behavior allegedly occurred. Nor has Gracia even tried to provide estimates of the number of times this behavior happened. To be sure, an exact number is not needed to render the testimony admissible, and the Court must draw all reasonable inferences in Gracia's favor. But without even an attempt at estimating the number of times, the only reasonable inference to be drawn from this evidence is that Silverman made these unwanted advances more than once. And that is of little help in deciding whether the number of these repeat advances, when added to the number of single instances of alleged harassment, was so pervasive as to be objectively hostile. C*f. Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789 (7th Cir. 2007) (holding that eighteen sexist or sexual comments in less than a year's time was sufficiently pervasive to survive summary judgment).

But as noted above, harassment need not be severe *and* pervasive to comprise a hostile work environment. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000) (citations omitted). Although a reasonable jury might not be able to find that the alleged harassment was so pervasive that it created a hostile work environment, a reasonable jury *could* find that the alleged harassment was so severe after weighing the alleged harassing acts together (instead of separately analyzing each incident, *see Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1045 (7th Cir. 2000) (citation

14

omitted)). Gracia paints a picture of a superior at work—indeed, the manager of the entire Elk Grove Village plant—who actively pursued an unwanted romantic relationship with her by asking to stay overnight at her house, asking her on dates, calling late at night to see if she wanted to meet up (sometimes while drunk), and singling her out for special treatment and attention. *See* PSAF ¶¶ 8-12, 17, 33; Gracia Dep. 117:6-121:15. Silverman's pursuit also escalated into an instance of physical touching where Silverman pulled down the neck of her sweater without permission at work, embarrassing her in front of her colleague. Gracia Dep. 115:11-116:22. What's more, his pursuit also included directing workplace emails at her, and often her alone, featuring partially naked women, women with digitally enlarged breasts, or both. *See* Pl.'s Exhs. B-D; *cf. Williams v. City of Chicago*, 325 F. Supp. 2d 867, 876 (N.D. Ill. 2004) (denying summary judgment for employer when a jury could infer that the plaintiff's former colleagues left pornography on her computer intending or hoping that she would see it). Critically, fending off Silverman's unwanted advances took its toll on Gracia (if the evidence is viewed in the light most favorable to her): she grew increasingly anxious to see Silverman and intentionally tried to avoid him as much as possible—even to the point of risking firing by coming to work late. Gracia Decl. ¶¶ 19-21. Indeed, Sandra Miedema, Sigmatron's corporate HR director, noticed that Gracia was "more dull," "lacked luster," and "wasn't Maria" as an assembly supervisor when Gracia was previously "always on time" and "always on top of her game" when she worked with Miedema in HR. Miedema Dep. 79:1-20. Sigmatron's own employee thus corroborated Gracia's testimony (again, after viewing the evidence in the light most

favorable to Gracia) that the harassment interfered with her work performance. *See Moser*, 406 F.3d at 902 (stating that whether harassment "unreasonably interferes with an employee's work performance" factors into objective severity). Thus, although each incident of alleged harassment standing alone might not be objectively severe, it is at least a jury question whether the alleged pattern of harassment, when viewed together, rose (or sunk) to that level. It is a close call, but at this stage, the Court cannot say that *no* reasonable jury would find that Silverman's behavior was so severe that it altered the conditions of Gracia's employment. *See, e.g., Jackson*, 474 F.3d at 499 (citation omitted). Gracia has satisfied the first prong of this test.

### b. Connection to Gender

Next, Gracia must present evidence that there is a genuine issue of material fact that Silverman's harassment was connected to Gracia's gender. Although Sigmatron argues that there is no connection, Def.'s Br. at 15, that argument is easily rejected. After viewing Gracia's evidence—emails sent to her depicting females in a demeaning light with breasts enlarged and exposed; unrequited invitations to meet up at night, go on dates, or stay overnight; individual deliveries of pastries on Valentine's Day and Sweetest Day; nonconsensual touching—in the light most favorable to her, a reasonable jury could certainly conclude that Silverman pursued a romantic relationship with Gracia and was thus motivated by Gracia's gender. *See, e.g., Oncale*, 523 U.S. at 80 ("Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is

16

reasonable to assume those proposals would not have been made to someone of the same sex."). Gracia has satisfied this prong as well.

### c. Basis for Employer Liability

Finally, there must be a basis for employer liability. Employer liability turns on what role Silverman played: was he Gracia's supervisor, or just a co-worker? If he was Gracia's co-worker, then Sigmatron is liable only if it was negligent in controlling working conditions. *Vance v. Ball State Univ.*, — U.S. —, 133 S. Ct. 2434, 2439 (2013). On the other hand, if Silverman was Gracia's supervisor, as that term is defined in *Vance*, and his harassment culminates in a tangible employment action, then Sigmatron is strictly liable. *Id.* But if he was a supervisor and did not take a tangible employment action, then Sigmatron may escape liability by establishing, as an affirmative defense, that (1) it exercised reasonable care to prevent and correct any harassing behavior and (2) Gracia unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. *Id.* (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).

In this case, Silverman was Gracia's supervisor. In *Vance*, the Supreme Court defined a supervisor as an employee who is empowered by the employer to take tangible employment actions against the victim. *Id.* at 2443. In other words, a supervisor must have authority to effect a significant change in employment status, "*such as* hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* (emphasis added) (internal quotation mark and citation omitted). Although that nonexhaustive

list of supervisory powers does not explicitly mention the authority to impose discipline, *Vance* adopted the Seventh Circuit's definition of "supervisor," and in the Seventh Circuit an employee who has the authority to discipline the harassment victim is a supervisor. *See, e.g., Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002) (quoting Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1034 (7th Cir. 1998)), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013). Here, Sigmatron itself asserts that Sigmatron empowered Silverman to discipline Gracia. DSOF ¶ 44. And indeed, the written Employee Disciplinary Notices and Records of Conversation detailing the verbal reprimands that Silverman issued to Gracia all bear Silverman's signature. *See* R. 41-8, Def.'s Exh. 8; 41-10-11, Def.'s Exhs. 10-11; R. 41-14, Def.'s Exh. 14. Thus, although Silverman may not have been able to fire Gracia by his lonesome, *see* DSOF ¶ 44, the fact that he could discipline her makes him her supervisor for Title VII purposes.

But as Gracia's supervisor, the most Silverman was solely responsible for was reprimanding her both orally and in writing without further consequences. *See* Def.'s Exhs. 8, 10-11, 14. For example, on October 30, 2008, Silverman issued a written warning to Gracia because she failed to have important documentation in place during an important plant tour by a prospective customer. *See* Def.'s Exh. 11 at SMT-GRACIA0095. Silverman's is the only signature from plant management on that form. *See id.* Compare that form with the two-day suspension without pay that Gracia received on October 15, 2008; both Silverman's *and* Fairhead's signatures appear on that written suspension. *See* Def.'s Exh. 9 at SMT-GRACIA0083. Thus, the evidence

18

shows that Silverman could only issue discipline that did not affect her pay, and reprimands that stand alone without material job consequences are not adverse employment actions. *See, e.g.*, *Porter v. City of Chicago*, 700 F.3d 944, 955 (7th Cir. 2012) (collecting cases); *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir. 2001).[6] So although Silverman was a supervisor, he never took a tangible employment action against Gracia, meaning that the *Ellerth* affirmative defense is still in play.

To escape liability, then, Sigmatron must establish that (1) it exercised reasonable care to prevent and correct any harassing behavior, and (2) Gracia unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. *Ellerth*, 524 U.S. at 765. On the first prong, although Sigmatron asserts that Gracia failed to follow Sigmatron's HR policy against harassment by not reporting all of the incidents of harassment, *see* Def.'s Br. at 16-17, "[t]he mere creation of a sexual harassment policy will not shield a company from its responsibility to actively prevent sexual harassment in the workplace." *Passananti v. Cook Cnty.*, 689 F.3d 655, 673 (7th Cir. 2012) (internal quotation marks and citation omitted). Rather, the true measure of reasonable care is whether the employer took prompt and appropriate corrective action that was reasonably likely to prevent further harassment, including, at a minimum, prompt investigation. *See Cerros v. Steel Techs.,*

---

[6]Indeed, in *Oest*, the Seventh Circuit rejected the idea that a reprimand is its own material consequence because it brings the recipient closer to termination: "Such a course [is] not an inevitable consequence of every reprimand, however; job-related criticism can prompt an employee to improve her performance and thus lead to a new and more constructive employment relationship." 240 F.3d at 613.

19

*Inc.*, 398 F.3d 944, 953-54 (7th Cir. 2005) (citations omitted). And here, although Gracia does admit that she never reported the full extent of Silverman's harassment, *see* Pl.'s Resp. DSOF ¶¶ 40-43, she explains in her declaration that she did try to report that Silverman had harassed her with more than just one late-night invitation to a supplier party, but that Fairhead was having none of it:

> Greg Fairhead spoke with me about these calls, in Patrick Silverman's presence, saying that, "it only happened one time," and generally talking over me, when I tried to correct Greg Fairhead's misimpression and report that there had been more than one call from the party and other unwanted calls and texts on other nights.

Gracia Decl. ¶ 31. Sigmatron asserts that this declaration contradicts her deposition testimony and thus should not be considered, Def.'s Resp. PSAF ¶ 24, but that is wrong. In Gracia's deposition, she testified, just as she averred in her declaration, that she tried to tell Fairhead that Silverman had called her on multiple occasions (and not just once to invite her to the supplier party), but that Fairhead refused to consider that complaint:

> Q:  Did you clarify for him [Fairhead] and tell him, It wasn't just that night, when he was trying to get me to come to the supplier party? He called me more than once. It was on multiple occasions he called me.
>
> A:  I tried, yes.
>
> Q:  What—how did you try? What did you say to him?
>
> A:  I was trying to talk to him, but he would just, you know, start talking again. Like, Maria, you know, it was just one time. Just stop. You know, We already talked to Patrick, you know. And he said, It was only that one time that he called. So every time I was trying to talk, he would talk over me, so . . .

Gracia Dep. 132:17-133:5. Thus, Gracia has presented evidence that Sigmatron (through Fairhead, who *was* authorized to suspend and fire Gracia) prejudged the truth of her accusations ("[I]t was just one time" and "We already talked to Patrick") and actively prevented her from airing the full scope of Silverman's harassment ("Just stop"). From this evidence, a reasonable jury who believes Gracia's account could find that Sigmatron acted unreasonably by not investigating the accusations of harassment at all, choosing instead to immediately take Silverman's word and sweep Gracia's complaints under the rug by short-circuiting the employee-reporting process. *See, e.g.*, *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 699-700 (7th Cir. 2001) (holding that the employer did not exercise reasonable care to prevent harassing misconduct when it did nothing after receiving a harassment complaint). And a jury that made that finding would find that Sigmatron is not entitled to the *Ellerth* affirmative defense and is liable for Silverman's harassment. As a result, there are now two genuine issues of material fact on Gracia's gender-based hostile work environment claim: (1) whether Silverman's harassment was objectively severe, and (2) whether Sigmatron is shielded from liability by the *Ellerth* affirmative defense. A jury must resolve these conflicts, so Sigmatron's motion for summary judgment on this claim is denied.

### 2. National-Origin Harassment

Gracia also brings a national-origin-based hostile work environment claim, although she barely argues it in her response brief. *See* Pl.'s Resp. at 12. Here, the evidence she presents that Silverman harassed her because of her national origin

(Mexican-American, *see* Gracia Decl. ¶ 2) are four emails over eleven months that ridicule Mexicans and Mexican immigrants:

1. A June 2007 email from Silverman proposing that the United States cut its gasoline usage by sending all illegal immigrants to fight in Iraq. Def.'s Exh. 24 at SMT-GRACIA0240.

2. An August 2007 email originally sent by Silverman (but forwarded from Trujillo) that was critical of Mexican immigrants and contained a picture of a mariachi band in a baseball stadium with the caption "Jose canoe si" and a map of North America where Mexico is labeled as "Yours" and the United States is labeled as "Not Yours." Pl.'s Exh. E.

3. A September 2007 email from Silverman entitled "Original Homeland Security" that said, "Ask the American Indians what happens when you don't control immigration." Pl.'s Exh. A.

4. An April 2008 email from Silverman containing a photograph of Gracia's sister holding a baby; the face of a former plant employee is superimposed over the baby's face and the photograph is captioned "Mama . . . leche por favor!" ("Mama . . . milk please!"). Pl.'s Exh. F.

Viewing these emails in the light most favorable to Gracia, the emails ham-handedly ridicule immigration (both legal and illegal, and most prominently those who emigrated from Mexico), the Spanish language, and Gracia's own sister.

But unlike Gracia's gender-based hostile work environment claim, this hostile work environment claim fails under the severe-or-pervasive test. As to severity, although the emails were undoubtedly offensive, no racial epithets were used in any of the complained-of incidents, much less epithets directed at her. *Compare Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 567 (7th Cir. 2004) (no hostile work environment where "motherfucking black niggers," "motherfucking niggers," or "black motherfuckers," were used but not directed at the employee), *and Peters v. Renaissance Hotel Operating*

*Co.*, 307 F.3d 535, 552 (7th Cir. 2002) (hotel supervisor's reference to black music as "wicka wicka woo music," suspicious treatment of African-American hotel guests, and one incident where a co-worker used the word "nigger" in the employee's presence did not constitute a hostile work environment), *with Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 868-89 (7th Cir. 2013) (reversing summary judgment for employer on hostile work environment claim where supervisors referred to workers on multiple occasions as "donkeys" and a "gorilla" and where a supervisor told the employee directly that the supervisor did not respect him because he was a "nigger")*, and Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1046-47 (7th Cir. 2002) (reversing summary judgment for employer on hostile work environment claim where the employee was called "brown boy, spic, wetback, Julio and Javier" by both coworkers and supervisors, where coworkers openly touted the Klu Klux Klan and "White Power," and where there was racially offensive graffiti on the bathroom walls). Gracia herself, moreover, avers that her workplace performance suffered because of Silverman's *sexual* harassment and not his *national origin* harassment. *See* Gracia Decl. ¶ 19. Finally, these four emails over eleven months are not sufficiently pervasive to support a hostile work environment claim. *See Peters*, 307 F.3d at 552 (six offensive incidents over one-and-a-half years of employment were not sufficiently pervasive).

To be sure, the emails that Silverman sent to Gracia (when viewed in the light most favorable to her) were crude. That Silverman introduced such content to the workplace—one where he managed the *entire plant*—speaks poorly of Silverman's professional judgment and maturity. But Title VII is not a "general civility code," *see*

*Oncale*, 523 U.S. at 81, and actionable harassment is only that which is "so severe or pervasive as to alter the terms or conditions of the employment relationship." *Jackson*, 474 F.3d at 499 (internal quotation mark and citation omitted). Even after viewing the evidence in the light most favorable to Gracia, no reasonable jury would find that she suffered a hostile work environment because of her national origin, so Sigmatron's motion is granted on that claim.

## B. Retaliation

Finally, Gracia brings a Title VII retaliation claim. In her view, Sigmatron violated Title VII by firing her in retaliation for filing an EEOC charge. *See* Pl.'s Resp. at 15-19. Sigmatron disagrees, asserting that it fired Gracia for poor performance, especially after she allowed her assembly workers to use lead-free solder on a leaded circuit board. *See* Def.'s Reply at 12.

In addition to prohibiting a hostile work environment, Title VII also prohibits retaliating against an employee "because [s]he has opposed any practice made an unlawful employment practice . . . or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). Like discrimination, retaliation may be established by either direct or indirect methods of proof. *Coleman*, 667 F.3d at 859 (citation omitted).[7] To survive summary judgment on her retaliation claim under the direct method, Gracia

---

[7]It is worth noting that a majority of active-service Seventh Circuit judges has now expressed that the direct/indirect-method analytical structure has caused more confusion than good, and that it is more straightforward to just ask "whether a reasonable jury could infer prohibited discrimination." *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 737 (7th Cir. 2013).

must show that (1) she engaged in activity protected by Title VII, (2) Sigmatron took an adverse employment action against her, and (3) there was a causal connection between her protected activity and the adverse employment action. *Id.* (citation omitted). The parties agree that the first two elements are satisfied, and for good reason: Gracia's formal EEOC charge was "the most obvious form of statutorily protected activity," and her termination was an adverse employment action. *Id.* at 859-60 (internal quotation marks and citation omitted). Thus, the remaining question is whether Gracia has demonstrated a causal link between her EEOC charge and her termination. Specifically, under the traditional principles of but-for causation, Gracia must show that Sigmatron fired her *because of* the EEOC charge. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, — U.S. —, 133 S. Ct. 2517, 2533 (2013).

To do that, Gracia can present either direct or indirect evidence. Gracia lacks direct evidence, which is unsurprising because direct evidence is generally hard to come by. *See Coleman*, 667 F.3d at 860 (describing direct evidence as "something akin to an admission by the employer ('I'm firing you because you had the nerve to accuse me of sex discrimination!')" (internal quotation mark and citation omitted)). She thus must rely on a "convincing mosaic" of circumstantial evidence that would permit the same inference without the employer's admission. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)) (internal quotation marks omitted). Under this approach, there are three categories of circumstantial evidence: (1) evidence of suspicious timing, (2) evidence that similarly situated employees were treated differently, and (3) evidence

25

that the employer offered a pretextual reason for an adverse employment action. *Coleman*, 667 F.3d at 860 (citations omitted). After viewing Gracia's evidence in the light most favorable to her, the Court concludes that she has presented sufficient evidence of suspicious timing and a pretextual termination to survive summary judgment under the direct method.

On the evidence of suspicious timing, Gracia's charge of discrimination was formally filed with the EEOC on December 1, 2008, *see* R. 1 at 7, and Fairhead fired Gracia a mere four days later on December 5, 2008. DSOF ¶ 27. Fairhead, moreover, testified that he knew, by the time he fired Gracia, that she had filed the EEOC charge (after viewing the deposition testimony in the light most favorable to Gracia). *See* Fairhead Dep. 92:5-11. That is sufficient evidence of suspicious timing. *See Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) ("Here, there is no question that [the supervisor] knew of [the employee's] complaints, and a mere 72 hours elapsed between the time [the employee] first complained to [the supervisor] of discrimination and [the supervisor's] abrupt decision to terminate [the employee], rendering close temporal proximity utterly transparent."). Although evidence of suspicious timing and temporal proximity is rarely dispositive to prove a causal link, *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003), it is still useful. And from Gracia's point of view, this timing is even more suspicious because of Sigmatron's indulgence towards her after it suspended her for two days and effectively placed her on probation on October 15, 2008. *See* Def.'s Exh. 9 at SMT-GRACIA0083 (warning Gracia not to "miss any scheduled time in the next 90 days or *immediate* termination will result" (emphasis

added)). Despite being on thin ice, Gracia received only written and oral discipline and was not immediately fired after she continued to perform poorly at work for the next few weeks. *See* Def.'s Exh. 10 at SMT-GRACIA0092 (October 23 oral warning about taking excessive breaks); Def.'s Exh. 11 at SMT-GRACIA0095 (October 30 written warning for not having proper documentation visible on the assembly line); Def.'s Exh. 14 at SMT-GRACIA0096 (October 30 written warning for being ten minutes late returning from lunch). Yet Sigmatron's tolerance of her continued tardiness and alleged poor performance suddenly changed just four days after Gracia filed her EEOC charge.

More importantly, Gracia has also presented sufficient evidence of a factual conflict over whether the decision to fire her was pretextual. Remember that Sigmatron asserts that it fired Gracia after her friend, Eduardo Trujillo, saw that Gracia's assembly line workers were using lead-free solder on leaded circuit boards; Trujillo confronted her but she did nothing, so he escalated the problem to Silverman and Fairhead. DSOF ¶¶ 19-24. Specifically, after Trujillo confronted Gracia, she "did nothing to stop the work and commented that 'I have done this many times before and nobody ever found out.'" Fairhead Memo. After Gracia confirmed Fairhead's understanding of the incident, Fairhead fired her for neglecting important customer specifications and displaying an unprofessional cavalier attitude. DSOF ¶¶ 25-28. The problem for Sigmatron now is that Gracia and Trujillo present a very different version of what happened, one that the Court must credit in deciding Sigmatron's motion for summary judgment. According to Gracia, after Trujillo told her about the lead-free

27

solder, she told him, "I'm going to—I'm going to make sure that it's done correctly. We're going to remove it, and we're going to move it to the leaded." Gracia Dep. 85:7-11. She then stopped the employee from using lead-free solder and gave her lead-free circuit boards to work on. Gracia Decl. ¶ 48. In Gracia's view, using the wrong solder was a frequent problem that had never gotten anyone fired before: "Well, we had issues sometimes where, you know, mistakes happened and, you know, if something like that happened, we would fix it. We would just start soldering everything leaded." Gracia Dep. 88:4-7; *see also* Gracia Decl. ¶ 43 ("The event which [Sigmatron] claims was the reason for my termination was a minor error of a type which had happened previously in the [Sigmatron] assembly plant in Elk Grove Village with no resulting discipline or terminations."). She also denied treating her responsibilities cavalierly by telling Fairhead that the mistake was not a big deal: "I had told him [Fairhead] that we had had that issue before and that before, you know, we would just solder leaded. *I never said it was okay.* I said that we would just fix the problem." Gracia Dep. 92:1-4 (emphasis added). Likewise, Trujillo testified that mixing solder types was a minor error that frequently cropped up. In fact, according to Trujillo, he told Fairhead as much:

> Q:    What did he [Fairhead] ask you?
>
> A:    That if Maria Gracia was using lead and lead-free products in one particular board.
>
> Q:    Okay. So that's the question that Mr. Gr[eg] Fairhead had asked you?

> A:     And I agreed with him because I believe everybody in the line, inspectors in line, inspectors before wave, inspectors past wave, inspectors in quality knew about it [mixing solder].[8]

Trujillo Dep. 17:17-18:1. And Trujillo denied even having the conversation with Gracia in which she told him, "I have done this many times before and nobody ever found out," which is key dialogue quoted by Fairhead to explain why Fairhead fired Gracia. *Id.* 22:10-14; *see also* Fairhead Memo. So there is a significant factual dispute: Sigmatron says it fired Gracia for not caring about a costly mistake, but Gracia (with help from Trujillo) says that she did care about the mistake and fixed it, but was fired anyway for a minor problem that had never before resulted in anyone else's termination.

Ultimately, a reasonable jury that believes Gracia (and Trujillo) could find that the reasons Sigmatron gave for firing her was simply pretext to retaliate against her, especially when coupled with the timing of the firing. "Pretext means a lie, specifically a phony reason for some action." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002) (internal quotation marks and citation omitted). A reasonable jury that believes Gracia and Trujillo would find that Gracia *had* addressed the lead-free soldering issue as soon as it was brought to her attention and was *not* being cavalier about her job responsibilities. It would find that using lead-free solder on leaded circuit boards was a common mistake and not nearly as serious as Sigmatron claimed it was. And it would also believe Trujillo when he denied even having the conversation with Gracia that Fairhead accused her of having in his termination memo. Having found those facts, the

---

[8]"Wave" refers to a type of soldering machine in the assembly process. *See* Trujillo Dep. 8:19-24.

jury would then disbelieve Sigmatron's reason for firing her (that she was cavalier in the face of a costly mistake and intentionally neglected her duties) and find that the reason was phony and a lie. From there, that jury would not have to leap far to find that her EEOC charge was the but-for cause of her firing, especially given the short four-day gap between those two events that abruptly changed Sigmatron's previously indulgent attitude toward her. To be clear, the Court is simply viewing this factual dispute in the light most favorable to Gracia, as it must; the Court is not making a credibility finding one way or another. That is a task for a jury, which is why Sigmatron's motion for summary judgment is denied on Gracia's retaliation claim.

## IV. Conclusion

For the reasons discussed above, Sigmatron's motion for summary judgment [R. 40] is granted as to Gracia's national-origin-based hostile work environment claim, but denied as to her gender-based hostile work environment and retaliation claims. At the next status hearing, which is accelerated from December 19, 2013 to November 7, 2013, at 8:30 a.m., the parties should be prepared to address the case schedule moving forward, including whether a settlement conference is sensible.

ENTERED:

    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: October 24, 2013

30