IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARIA N. GRACIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.   11 CV 07604 |
| | ) | |
| SIGMATRON INTERNATIONAL, INC. | ) | Hon. Edmond E. Chang |
| | ) | |
| Defendant. | ) | |

**DEFENDANT SIGMATRON INTERNATIONAL, INC.'S POST-TRIAL MOTIONS
PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE
50(b), 59(a), AND 59(e)**

Defendant SigmaTron International, Inc. ("SigmaTron"), by and through its attorneys Timothy J. Riordan and Tiffany L. Carpenter of Howard & Howard Attorneys PLLC, respectfully renews its Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50(b) and, in the alternative, also moves this Honorable Court pursuant to Rule 59(a) for a new trial, or in the alternative, pursuant to Rule 59(e), for a remittitur of the compensatory and punitive damages awarded to Plaintiff.

## INTRODUCTION

Given that the evidence in this case does not support either the jury's verdict or its award, the Court should grant SigmaTron's Motion for Judgment as a Matter of Law, Motion for a New Trial, or, in the alternative, Motion for Remittitur. On December 18, 2014, the jury rendered a verdict in favor of Plaintiff on her retaliation claim [Doc. No. 186]. The jury's verdict was against the manifest weight of the evidence. The evidence at trial demonstrated that SigmaTron's Executive Vice President Gregory Fairhead terminated Plaintiff's employment with SigmaTron for cause after he conducted an investigation and determined that Plaintiff knowingly and purposely produced product for a customer that did not comply with the customer's written specifications. There was no evidence at trial that Mr. Fairhead would not have fired Plaintiff had she not made a complaint to SigmaTron and the Equal Employment Opportunity Commission that she was being sexually harassed and that she was being harassed because of her national origin. For these reasons, the jury's verdict is contrary to the law and unsupported by the evidence. Therefore, SigmaTron is entitled to judgment as a matter of law pursuant to Rule 50(b).

If the Court denies SigmaTron's Rule 50(b), the Court should grant SigmaTron's Rule 59(a) Motion because under Rule 59(a), the Court may consider the credibility of the witnesses and the weight of the evidence. When the Court considers the credibility of the witnesses and the comparative strength of the facts, it is undeniable that the jury's verdict is against the

manifest weight of the evidence. Pursuant to Rule 59(a), SigmaTron should be granted a new trial on Plaintiff's retaliation claim.

If the Court does not grant SigmaTron's Rule 59(a) Motion, the Court should grant SigmaTron's Motion for Remittitur pursuant to Rule 59(e) because the compensatory and punitive damages awarded to Plaintiff are wildly excessive, not supported by evidence, and are evidently the result of evidentiary and instructional errors. The jury awarded Plaintiff $57,000 in compensatory damages to make Plaintiff whole for feeling "just depressed." Plaintiff offered no evidence that feeling "just depressed" affected her in any negative way. Plaintiff's failure to factually support her allegations of emotional distress as a result of her termination demonstrates the unreasonableness of the jury's compensatory award.

Further, the award of $250,000 in punitive damages against SigmaTron, which was in excess of the $200,000 Plaintiff requested for ***both*** her retaliation claim and her rejected sexual harassment claim, was monstrously excessive and was unsupported by the evidence. Therefore, if the Court denies SigmaTron's Rule 50(b) and Rule 59(a) Motions, the Court should grant SigmaTron's Rule 59(e) Motion and right the wrongs that unduly prejudiced SigmaTron at trial and led to the jury's verdict by remitting the jury's compensatory and punitive damages award to zero.

## ARGUMENT

### I. SIGMATRON'S RULE 50(b) MOTION SHOULD BE GRANTED AND JUDGMENT AS A MATTER OF LAW SHOULD BE ENTERED IN SIGMATRON'S FAVOR ON PLAINTIFF'S RETALIATION CLAIM

Pursuant to Federal Rule of Civil Procedure 50(b), SigmaTron seeks entry of judgment as a matter of law in its favor because there is insufficient evidentiary support for the jury verdict against SigmaTron on Plaintiff's retaliation claim. A party, like SigmaTron, shall prevail on its renewed motion for judgment as a matter of law following a jury trial where the party shows "that the jury's findings are not supported by substantial evidence or, if they were, that the legal

conclusion(s) implied by the jury's verdict cannot in law be supported by those findings." *Hall v. Forest River, Inc.*, 536 F.3d 615, 619 (7th Cir. 2008); *see also Massey v. Blue Cross-Blue Shield of Illinois*, 226 F.3d 922 (7th Cir. 2009). Substantial evidence "is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer*, 732 F.2d at 893. The court should administer the rule so as to accomplish all that is permissible under its terms. *Shaw v. Edward Hines Lumber Co.*, 249 F.2d 434, 439 (7th Cir. 1957). A mere scintilla of evidence supporting a claim is not sufficient to avoid judgment as a matter of law. *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 545 (7th Cir. 1997).

In order to avoid a judgment as a matter of law, there must be sufficient evidence on which the jury reasonably could find for the nonmoving party. "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that [a party] is entitled to a verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

The jury's verdict on Plaintiff's retaliation claim cannot stand because no jury could reasonably find, based on the evidence at trial, that Mr. Fairhead would not have fired Plaintiff had she not made a complaint to SigmaTron or the Equal Employment Opportunity Commission that she was being sexually harassed or that she was being harassed because of her national origin. To the contrary, the uncontradicted evidence shows that Mr. Fairhead terminated Plaintiff's employment because, following an investigation, he determined that Plaintiff had knowingly allowed her subordinates to violate customer specifications and showed no remorse or concern for having done so.

The following uncontroverted evidence relevant to Plaintiff's retaliation claim, even when taken in the light most favorable to Plaintiff, supports a finding in SigmaTron's favor on its Rule 50(b) Motion:

It is critical that SigmaTron follow its customers' specifications and not violate its contracts with its customers [Doc. No. 190, 382: 2-6] because:

- SigmaTron promises its customers that it will strictly adhere to its customers' specifications. [Doc. No. 190, 381: 9-13].

- Regulatory and industry directives require that SigmaTron strictly follow its customers' specifications *exactly*. [Doc. No. 188, 204: 13-18].

- Failure to follow customers' specifications could lead to future problems, such as, product failure arising from cold solder and bad solder junctions. [Doc. No. 189, 245: 1-5].

- Plaintiff's own witness, Michael Murphy, admitted it would be an ethical problem to violate customers' specifications (e.g. to send leaded circuit boards overseas). [Doc. No. 191, 545: 10-13].

SigmaTron goes to great lengths to ensure that its customers' specifications are followed:

- SigmaTron creates a written control document for every customer that identifies, among other things, the type of circuit board and solder the customer has specified must be used [Doc. No. 188, 205: 13-20; Doc. No. 190, 381: 15-17] in the form of both bills of material and visual aids. [Doc. No. 188, 205: 11-20].

- No changes to any customer's specification can be made orally [Doc. No. 188, 204: 19-24]; to make a change to a customer's written specifications, the customer must issue an Engineering Change Order or an Engineering Change Notice confirming to SigmaTron that it is changing something on its circuit board. [Doc. No. 190, 381: 18-382: 1].

- SigmaTron provides its employees with training about the importance of following customers' specifications [Doc. No. 189, 235: 11-13] and how to follow customers' specifications, which takes the form of classroom soldering training, including, hands-on soldering practice, component identification, and the general soldering process. [Doc. No. 189, 235: 15-17].

- Certain customers' specifications require a RoHS assembly or an assembly without lead and five other substances. [Doc. No. 190, 392: 14-16; 20-23]. Even though RoHS solder and leaded solder are basically the same color and consistency [Doc. No. 191, 567: 11-15], significant differences exist between the two solders. For example, RoHS solder and leaded solder require that different temperatures be applied for effective soldering. Specifically, RoHS soldering requires a hotter temperature than does leaded solder. [Doc. No. 190, 393: 8-10].

4

If the wrong temperature is used while soldering a circuit board, a cold solder joint or a fracture of the solder could occur, resulting in a latent failure. [Doc. No. 190, 393: 13-16]. To comply with its customers' specifications that require a RoHS assembly, SigmaTron created a RoHS only room that is separate from the rest of the plant to prevent contamination of RoHS assemblies. [Doc. No. 190, 389: 9-14; 16-23; Doc. No. 189, 253: 19-22].

- SigmaTron conducts internal and external third party audits to make sure it is following its customers' specifications. [Doc. No. 189, 240: 17-19; 252: 7-10].

The customer's specifications for the circuit boards at issue in Plaintiff's termination required that only leaded solder be used on the leaded circuit boards. [Doc. No. 188, 206: 9-17; 25-207: 2; 5-7; 11-21; 208: 4-7] Trial Exh. Def_15-2. Accordingly, based on her training, knowledge, and responsibilities, Plaintiff should never have allowed her hand solderers to use RoHS solder in the RoHS room when the customer's specifications required leaded solder:

- Plaintiff was required to follow the policies of the company [Doc. No. 190, 398: 2-4], was trained to follow customers' specifications [Doc. No. 190, 401: 8-10], and knew that if she violated customers' specifications she would be violating SigmaTron's policies. [Doc. No. 191, 500: 20-22].

- Plaintiff was trained how to properly hand solder [Doc. No. 189, 238: 5-11] and how to tell the difference between RoHS and leaded solder. [Doc. No. 190, 401: 4-7].

- Plaintiff knew that mixing solders and violating customers' specifications was wrong. [Doc. No. 189, 341: 14-20; 342: 4-5; Doc. No. 190, 420: 20-23; 421: 2].

- As an Assembly Supervisor, it was Plaintiff's job to:

    - ensure that assembly line workers and hand solders followed customers' specifications. [Doc. No. 191, 500: 23-501: 1; Doc. No. 190, 399: 10-14].

    - ensure that group leaders did their jobs. [Doc. No. 191, 501: 2-4].

    - ensure day-to-day objectives to produce assemblies for SigmaTron's customers were being met. [Doc. No. 189, 254: 24-255: 2].

    - direct the performance of tasks. [Doc. No. 190, 398: 25-399: 1].

5

- ensure that each hand solderer was working on the correct circuit boards. [Doc. No. 190, 391: 12-15].

- ensure printed circuit board output and quality. [Doc No. 189, 255: 4-16]; Trial Exh. Def_12.

- direct, train, and discipline her team members (hand solders). [Doc. No. 189, 255: 4-16]; Trial Exh. Def_12.

- stop production due to quality, safety, or customer requirement issues. [Doc. No. 189, 255: 17-19]; Trial Exh. Def_12.

- ensure the product was produced on time. [Doc. No. 190, 461: 10-14].

The evidence supports that Mr. Fairhead believed that Plaintiff knowingly and purposely produced product for a customer that did not comply with the customer's specifications:

- On December 4, 2008, Mr. Fairhead was told that Plaintiff was allowing her hand solderers to use RoHS solder on a leaded circuit board in the RoHS room even though the customer's specifications required leaded solder and leaded circuit boards were not allowed in the RoHS room. Trial Exh. Def_20 [Doc. No. 191, 501: 17-19; Doc. No. 188, 193: 22-24; Doc. No. 190, 416: 8-10; 14; Doc. No. 189, 244: 7-12].

- On December 4, 2008, Mr. Fairhead was told, that Eduardo Trujillo, Plaintiff's peer and friend, had asked Plaintiff why she was allowing this to occur, and that Plaintiff did nothing to stop her hand solderers and commented, "I have done this many times before and nobody ever found out." Trial Exh. Def_20 [Doc. No. 189, 243: 12-14; Doc. No. 189, 244: 13-15; Doc. No. 188, 193: 22-24; Doc. No. 190, 414: 7-10].

- On December 4, 2008, Mr. Fairhead was told that Mr. Trujillo brought Plaintiff's actions and comments to their joint supervisor, Patrick Silverman, and that Mr. Silverman then asked Plaintiff what was going on and Plaintiff commented it doesn't matter or it's no big deal, we do it all the time. Trial Exh. Def_20 [Doc. No. 189, 244: 13-15; Doc. No. 188, 193: 22-24; 195: 2-6].

- On December 4, 2008, Mr. Fairhead was told that when Mr. Silverman confirmed that Plaintiff was in fact mixing the solder types on the customer's assembly, Mr. Silverman stopped the employees from working on the leaded circuit boards in the RoHS room [Doc. No. 189, 243: 24-244: 2; 13-15; Doc. No. 188, 158: 5-15; 193: 22-24] and immediately segregated the product that had been mixed with the

wrong solder in that assembly area. [Doc. No. 188, 158: 12-15; 193: 22-24; 189, 243: 24-244: 2].

- On December 4, 2008, Mr. Fairhead went to the RoHS room, saw the circuit boards that had been segregated and put into quarantine [Doc. No. 190, 366: 20-23; 367: 4-7] and saw a normal operation running properly. [Doc. No. 190, 366: 24-367: 2].

- On December 4, 2008, Mr. Fairhead met with the Corporate Human Resources Manager, Sandy Miedema, and discussed what Mr. Fairhead had learned about Plaintiff's actions and comments to Mr. Trujillo and to Mr. Silverman; Mr. Fairhead and Ms. Miedema decided to meet with Mr. Trujillo the next day to discuss the matter with him. [Doc. No. 189, 340: 10-13; 21-341: 2].

- On December 5, 2008, Mr. Fairhead met with Mr. Trujillo and he confirmed to them what Mr. Fairhead had been told by Mr. Silverman the previous day. Trial Exh. Def_20; [Doc. No. 189, 341: 3-8].

- On December 5, 2008, Mr. Fairhead met with Ms. Miedema and with Plaintiff and Plaintiff admitted that she knew that mixing solders and violating customers' specifications was wrong; Plaintiff never said she had fixed the problem. [Doc. No. 189, 341: 14-20; 342: 4-5; Doc. No. 190, 420: 20-23; 421: 2].

The evidence supports Mr. Fairhead's decision to terminate Plaintiff's employment:

- When Mr. Fairhead took on the responsibilities of SigmaTron's Director of Operations, he took measures to tighten up the operation. [Doc. No. 190, 396: 20-397: 1].

- If someone knowingly allowed their employees to hand solder circuit boards contrary to a customer's specifications, that would be a serious violation of company policy. [Doc. No. 191, 551: 11-15].

- The only reason Mr. Fairhead terminated Plaintiff's employment with SigmaTron was because of the soldering incident. [Doc. No. 190, 370: 3-6].

When considering SigmaTron's Rule 50(b) Motion, the Court should also consider what is missing from the record. *Estate of Escobedo v. Martin*, 702 F.3d 388, 403 (7th Cir. 2012) (Judgment as a matter of law is appropriate when there is "no legally sufficient evidentiary basis for a reasonable jury" to find for the nonmoving party):

- There was no evidence that Mr. Fairhead knew before December 5, 2008 that Plaintiff or any other SigmaTron employees had knowingly violated a customer's specifications or SigmaTron's policies to follow its customers' specifications.

- There was no evidence that Mr. Fairhead knew, prior to December 5, 2008, that Plaintiff or any other SigmaTron employee had used RoHS solder on a leaded board in the RoHS room.

- There was no evidence that Mr. Fairhead did not terminate or otherwise discipline any other SigmaTron employee whom he knew to have committed the same acts as Plaintiff (e.g. knowingly and purposely producing product for a customer that did not comply with a customer's written specifications) or any employee whom he had thought committed the same act inadvertently.

When weighing Mr. Fairhead's knowledge and actions against the mere temporal proximity of Plaintiff's termination to her EEOC charge or alleged complaint of sexual harassment, no reasonable jury could find that Mr. Fairhead would not have terminated Plaintiff's employment but for her filing of her EEOC charge or alleged complaint of sexual harassment. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011) ("The timing of events in this case is not strongly suggestive of retaliation, either alone or in the context of other circumstances [plaintiff] has cited").

"[I]t is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 601 (7th Cir. 2010) (quoting *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005). The record is void of any evidence to support the proposition that Mr. Fairhead terminated Plaintiff's employment with SigmaTron because she complained to the company about sexual harassment or filed an EEOC charge. Accordingly, the Court should grant SigmaTron's Rule 50(b) Motion because "there is no legally sufficient evidentiary basis for a reasonable jury to find for [Plaintiff on her retaliation claim]." *Hall*, 536 F.3d at 619.

## II. SIGMATRON'S RULE 59(a) MOTION SHOULD BE GRANTED AND THE COURT SHOULD ORDER A NEW TRIAL ON PLAINTIFF'S RETALIATION CLAIM

Should the Court deny SigmaTron's Rule 50(b) Motion, the Court should grant SigmaTron's Rule 59(a) Motion and order a new trial on Plaintiff's retaliation claim. The Supreme Court has long recognized that a district court can grant a motion for a new trial if the verdict was against the weight of the evidence. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996); *Byrd v. Blue Ridge Rural Elec. Coop., Inc.*, 356 U.S. 525, 540 (1958); *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). In considering whether a new trial is warranted, the district court has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial. *See, e.g., Byrd*, 356 U.S. at 540 ("The trial judge in the federal system has powers denied to the judges of many States to comment on the weight of evidence and credibility of witnesses...."); *United States v. Washington*, 184 F.3d 653, 658 (7th Cir. 1999) ("In considering the weight of the evidence, the court must necessarily consider the credibility of the witnesses."); *Bob Willow Motors, Inc. v. Gen. Motors Corp.*, 872 F.2d 788, 798 (7th Cir.1989) ("In ruling on a motion for a new trial, the judge may consider the credibility of witnesses, the weight of the evidence, and anything else which justice requires."). If, after evaluating the evidence, the district court is of the opinion that the verdict is against the manifest weight of the evidence, like it is in this case, a new trial is appropriate. *ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.*, 353 F.3d 541, 544 (7th Cir. 2003).

For the aforementioned reasons in support of SigmaTron's Rule 50(b) Motion, this Court should grant SigmaTron's Rule 59(a) Motion and order a new trial on Plaintiff's retaliation claim. This is especially warranted under Rule 59(a) because when the Court assesses the credibility of the witnesses and the comparative facts at issue, no reasonable jury could find that but for Plaintiff filing her EEOC charge or allegedly complaining to SigmaTron about sexual harassment, Mr. Fairhead would not have terminated Plaintiff's employment.

9

Given the evidence in this case, a reasonable jury would find that Mr. Fairhead believed that if Mr. Trujillo had never brought Plaintiff's violation of the customer's specifications to Mr. Silverman's attention, the leaded only circuit boards would have been shipped to the customer even though they did not comply with the customer's specifications. A reasonable jury would also find that Mr. Fairhead terminated Plaintiff's employment with SigmaTron because he reasonably believed Plaintiff knowingly violated SigmaTron's policies and customer's specifications and put SigmaTron and its customers and the end users of its products in grave danger. A reasonable jury would make these determinations because there is no evidence in the record to outweigh these findings.

### III. SIGMATRON'S RULE 59(e) MOTION SHOULD BE GRANTED AND THE COURT SHOULD ORDER A REMITTITUR OF THE COMPENSATORY AND PUNITIVE DAMAGES AWARD TO ZERO

Should the Court deny SigmaTron's Rule 59(a) Motion, pursuant to Rule 59(e), the Court should order a remittitur of the compensatory damages and punitive damages award beyond the $7,000 reduction required by statute. 42 USC § 19871a(b)(3)(D).

#### A. *The Compensatory Damages Award should be Reduced to Zero*

When considering whether to reduce an award of compensatory damages, courts generally weigh three factors: 1) whether the award is "monstrously excessive"; 2) whether the award has a "rational connection" with the evidence; and 3) whether the award is "roughly comparable to awards made in similar cases." *David v. Caterpillar, Inc.*, 324 F.3d 851, 864 (7th Cir. 2003). The Seventh Circuit has characterized the "monstrously excessive" factor as "simply ... another way of asking whether there is a rational connection between the award and the evidence." *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 713-14 (7th Cir. 2004). "[T]he slighter the emotional distress, the lower the ceiling on a reasonable award of damages." *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1229 (7th Cir. 1995). "[D]amages must be proportioned to injury, so that the slighter the injury the smaller must be the award of damages."

*Id.* "Judges and juries must not be casual with other people's money." *Id.* The following table catalogues a sample of jury awards for emotional distress damages in several recent employment cases.

| CASE | COMPENSATORY DAMAGES | DESCRIPTION |
|---|---|---|
| *Gracia v. SigmaTron* (2014) | $57,000 | <ul><li>Retaliation</li><li>No direct evidence</li><li>Plaintiff complains it was hard not working</li><li>Plaintiff complains she was "just depressed"</li></ul> |
| *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1228 (7th Cir. 1995) | $10,500 (reduced by remittitur from $21,000) | <ul><li>Retaliation</li><li>$21,000 excessive for a plaintiff who was still "deeply distressed" years after</li></ul> |
| *Marion County Coroner's Office v. E.E.O.C.*, 612 F.3d 924 (7th Cir. 2010) | $20,000 (reduced by remittitur from $200,000) | <ul><li>Race Discrimination, Retaliation</li><li>Plaintiff in weekly therapy for months</li><li>Diagnosed with "situational depression"</li></ul> |
| *David v. Caterpillar, Inc.*, 185 F. Supp. 2d 918, 926 (C.D. Ill. 2002) *aff'd*, 324 F.3d 851 (7th Cir. 2003) | $50,000 (reduced by remittitur from $100,000) | <ul><li>Retaliation – Failure to promote</li><li>Plaintiff testified she "Felt robbed", "cheated", "like a truck had just run [her] over", like she had been sent a message by employer</li><li>Plaintiff for two weeks would go home and go right to bed, suffered from stomach aches, difficulty sleeping, anxiety and stress</li></ul> |

The information contained in this table demonstrates the jury's compensatory damages award in the instant action is not comparable to similar cases within the Seventh Circuit. In the cases set forth above, the emotional distress suffered by the employee was far greater than Plaintiff's alleged emotional distress but the damages awarded or remitted were significantly less than the award in the instant action.

11

In *David v. Caterpillar, Inc.*, 185 F. Supp. 2d 918, 924 (C.D. Ill. 2002), plaintiff claimed defendant retaliated against her after she complained about not being promoted. Plaintiff testified at trial that she felt "robbed", "cheated", "like a truck had just run [her] over", for two weeks went to bed directly after work and suffered from anxiety and stress as a result of being retaliated against. *Id.* The court reduced the $100,000 award to $50,000 noting that this was the "outermost award that can be supported." *Id.*

In *Avitia*, 49 F.3d 1219, 1229 (7th Cir. 1995), plaintiff was retaliated against and terminated after he asserted his right for overtime pay. Plaintiff testified that after being terminated he broke down and started crying, felt like he "had been thrown away like a piece of paper", and was still "deeply distressed" by the termination years later. *Id.* at 1229. The jury awarded plaintiff $21,000, which the court reduced to $10,500 finding that "an award of $21,000 is too much for a moment's pang of distress at being fired." *Id.*

In this case, Plaintiff testified that because she has always been used to working, it was hard and she was "just depressed." [Doc No. 191, 493: 5-8]. The jury's verdict of $57,000 in compensatory damages: 1) is "monstrously excessive" in comparison to the aforementioned Seventh Circuit Cases, 2) bears no rational connection to the evidence, and 3) pales in comparison to other awards of other cases within the Seventh Circuit. For these reasons, a remittitur of the compensatory damages to zero is warranted.

**B.** *The Punitive Damages Award Should be Reduced*

The Seventh Circuit has "three guideposts" it uses to determine "whether a punitive damages award is grossly excessive such that it offends due process: (1) the degree of reprehensibility of defendant's conduct; (2) the disparity between the harm or potential harm suffered by the plaintiff and his punitive damages award; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Kapelanski v. Johnson*, 390 F.3d 525, 534 (7th Cir.2004) (citing *BMW of N.A., Inc. v. Gore*, 517 U.S. 559, 575

12

(1996). The showing needed for liability for punitive damages requires a higher standard of culpability than the showing required for compensatory damages. *See Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 766-67 (7th Cir. 1994). The Seventh Circuit has suggested that the maximum available punitive damages awards should be reserved for the most egregious cases. *David v. Caterpillar, Inc.*, 185 F. Supp. 2d 918, 926 (C.D. Ill. 2002). The following table catalogues a sample of jury awards for punitive damage in several recent employment cases.

| **CASE** | **PUNITIVE DAMAGES** | **DESCRIPTION** |
| --- | --- | --- |
| *Gracia v. SigmaTron* (2014) | $250,000 | • Fired for violating company policies and failing to follow customer specifications |
| *Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761 (7th Cir. 1994) | $0 (reduced from $413,812) | • Retaliation Claim<br>• Fired for violating company policy |
| *David v. Caterpillar, Inc.*, 185 F. Supp. 2d 918, 926 (C.D. Ill. 2002) aff'd, 324 F.3d 851 (7th Cir. 2003) | $150,000 (reduced by remittitur from $750,000) | • Retaliation – Failure to promote<br>• Another female employee also victim of similar discriminatory animus<br>• Employer attempted to conceal improper motive<br>• Demonstrated reckless disregard for plaintiff's right to engage in protected activity |

Similarly, the punitive damages awarded in this matter do not reflect the reprehensibility of SigmaTron's termination of Plaintiff or the disparity between the harm or potential harm suffered and are not comparable to other cases within the Seventh Circuit.

In *Caterpillar*, the court reduced the original award of $750,000 down to $150,000 finding that even "a punitive award of $250,000 would be excessive and shocking to the judicial conscience" and punitive damages of four times the amount of compensatory damages were only appropriate "where the acts are particularly egregious." *Id.* The opinion suggests the court would have further reduced the damages award but for defendant's reckless disregard of plaintiff's rights and continuous belief that plaintiff was in a better position now in light of the retaliation.

13

There is no evidence of egregious conduct by SigmaTron or reckless disregard for Plaintiff's protected rights exists related to Plaintiff's retaliation claim. The evidence show that SigmaTron terminated Plaintiff's employment with SigmaTron because Mr. Fairhead reasonably believed Plaintiff knowingly violated company policy and customer specifications.

The punitive damage award of $250,000 or almost five times the compensatory damages award is not supported by the facts of this case. The punitive damages award actually exceeds the $200,000 award Plaintiff's counsel asked for **both** of Plaintiff's claims. Given the fact that the verdict form did not indicate that the jury could award punitive damages to Plaintiff for only those claims for which the jury found in Plaintiff's favor and the fact that the jury instructions (which the jury's five questions during deliberations demonstrate they carefully considered), it is evident that SigmaTron was unjustly prejudiced by the evidence related to Plaintiff's sexual harassment claim such that the jury awarded Plaintiff punitive damages to compensate Plaintiff for all of the wrongs they believed SigmaTron committed related to Plaintiff's sexual harassment claim even though the jury did not find that the evidence cumulatively did not support Plaintiff's sexual harassment claim.

In light of the comparable Seventh Circuit precedent and the foregoing reasons set forth above, the punitive damage award of $250,000 should be remitted to zero.

## Conclusion

**WHEREFORE**, for the foregoing reasons, SigmaTron International, Inc. respectfully requests that the Court:

1) grant its Motion Pursuant to Rule 50(b) and enter Judgment Notwithstanding the Verdict for SigmaTron and against Plaintiff on Plaintiff's retaliation claim; or

2) if the Court denies SigmaTron's Rule 50(b) Motion, grant SigmaTron's Motion Pursuant to 59(a) for a new trial on Plaintiff's retaliation claim; or

3) if the Court denies SigmaTron's Rule 50(b) and Rule 59(a) Motions, grant SigmaTron's Motion Pursuant to 59(e) for a remittitur of the compensatory and punitive damages awarded to Plaintiff to zero.

Dated: January 15, 2015

**SIGMATRON INTERNATIONAL, INC.**, a corporation,

By: */s/ Tiffany L. Carpenter*
One of its Attorneys

Timothy J. Riordan (ARDC No. 2343231)
Tiffany L. Carpenter (ARDC No. 6292517)
Howard & Howard Attorneys, PLLC
200 S. Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: 312-472-4000
TCarpenter@HowardandHoward.com

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on January 15, 2015, I electronically filed a true and correct copy of the foregoing document with the Clerk of this Court using the CM/ECF system, which is believed to have sent notification of such filing to all counsel of record.

By: /s/ Tiffany L. Carpenter
One of Defendant's Attorneys

Timothy J. Riordan (ARDC No. 2343231)
Tiffany L. Carpenter (ARDC No. 6292517)
Howard & Howard Attorneys, PLLC
200 S. Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: 312-472-4000
TCarpenter@HowardandHoward.com