# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MARIA N. GRACIA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 11 C 07604 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| SIGMATRON INTERNATIONAL, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER

After a three-day trial in December 2014, a jury found in favor of Sigmatron International, Inc. on Maria Gracia's claim that she had been the victim of workplace harassment, in violation of Title VII of the Civil Rights Act of 1964. But the jury did find that Sigmatron had unlawfully retaliated against Gracia by firing her after she complained about the allegedly discriminatory treatment, and awarded her $57,000 in compensatory and $250,000 in punitive damages. Sigmatron now moves for judgment as a matter of law on the retaliation claim under Federal Rule of Civil Procedure 50(b), or, in the alternative, for a new trial under Rule 59(a) and remittitur of the damages award under Rule 59(e). For the reasons described below, the motions for judgment as a matter of law and new trial are denied. The remittitur motion is granted only to the extent that the compensatory damages award is lowered to $50,000 to comply with a statutory cap, which Gracia does not oppose.

## I. Motion for Judgment as a Matter of Law

Sigmatron argues that judgment should be granted in its favor as a matter of law on Gracia's retaliation claim under Rule 50, which provides such relief where "a reasonable jury [lacks] a legally sufficient evidentiary basis to find for the [prevailing] party[.]" Fed. R. Civ. P. 50(a). In weighing a Rule 50(a) motion, "the question is simply whether the evidence as a whole, when combined with all reasonable inferences permissibly drawn from that evidence, is sufficient to allow a reasonable jury to find in favor of the plaintiff." *Hall v. Forest River, Inc.*, 536 F.3d 615, 619 (7th Cir. 2008) (citing *Hossack v. Floor Covering Assoc. of Joliet, Inc.*, 492 F.3d 853, 859 (7th Cir. 2007)). A jury's determination may be overturned only if "no rational jury could have found for plaintiff," and there must also be more than "a mere scintilla of supporting evidence." *Walker v. Bd. of Regents of Univ. of Wisconsin Sys.*, 410 F.3d 387, 393 (7th Cir. 2005) (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1173 (7th Cir. 2002)). The court must "not make credibility determinations or reweigh the evidence," and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Tart v. Illinois Power Co.*, 366 F.3d 461, 472 (7th Cir. 2004).

Sigmatron argues that the evidence showed Gracia was fired for a legitimate reason: she improperly allowed hand solderers under her watch to use lead-free instead of leaded solder, in violation of customer specifications. R. 196, Def.'s Br. at 4-5. Sigmatron emphasizes evidence at trial about the importance the company placed in meeting customer specifications, driven partly by regulatory and industry

directives. *Id.* (citing *inter alia* testimony about company's training on proper soldering and auditing procedures). Gregory Fairhead, Sigmatron's vice president, testified that it was Gracia's involvement in the solder discrepancy that led to her firing. R. 190, Trial Tr. at 370.[1]

Sigmatron relies heavily on this mistake in soldering, and it is true that, standing alone, the problem sounds serious. But Sigmatron does not come to grips with the fact that the jury had plenty of reason not to believe that the lead-free solder really drove the company to fire Gracia. The jury heard testimony that, in reality, Sigmatron did from time to time—indeed even *often*—use solder types that did *not* fit client specifications, without any negative ramifications for the responsible employees. Gracia unsurprisingly testified to this effect. Trial Tr. at 463. Under the deferential standard applicable here, that testimony alone undermines Sigmatron's asserted explanation.

But that is not all. Eduardo Trujillo, a former Sigmatron automation manager, also testified that this practice occurred "often," yet nobody had ever been fired as a result. *Id.* at 557-59. There is more. Michael Murphy, a former Sigmatron engineer, also testified that leaded and lead-free solders were used interchangeably "a lot of [the] time," irrespective of customer preference, in order to make do with whatever parts were available *as a matter of company policy*. *Id.* at 543-44 (adding that no one had ever been fired for switching leaded and lead-free solders). Sigmatron's reliance on customers' solder specifications could well have struck the

---

[1] The trial transcript is divided into several docket entries, R. 187-193, but the pages are (as they are required to be) consecutively numbered. The Court cites only to the page numbers in question and not the specific docket entry.

3

jury as pretextual in light of the evidence that the company did not really care if errors were made at least before this lawsuit was filed..

It is true that, even if company managers had shrugged their shoulders at lax compliance in the past, it is still possible that Sigmatron belatedly chose to clean-up shop, starting with Gracia. Fairhead testified that when he took over as director of operations in 2007, he sought to "tighten up ... certain things," including manufacturing procedure. *Id.* at 396. But the jury was not obliged to credit that scenario when weighing the conflicting testimony from Fairhead and management (that is, the correct-solder rule was life-and-death vital) on the one hand, and from other managers and employees (that is, the purported rule was not enforced, ever) on the other.

Indeed, the jury had another reason to doubt Fairhead's account. Fairhead testified at length about the events that purportedly led to Gracia's firing: Trujillo discovered Gracia's solder error, noted a cavalier indifference from Garcia when she was questioned about it, and then went to supervisor Patrick Silverman, all of which was reported to Fairhead. *Id.* at 414-15. The problem is that Trujillo denied having *any* discussion with Silverman at all about the soldering, let alone a discussion where Gracia displayed a cavalier attitude toward the mistake. *See id.* at 556-57. And Trujillo described the conversation with Fairhead as simply saying that Trujillo was aware of the mistake. *Id.* at 557. In light of the conflicting testimony, it was certainly within the province of the jury, relying on its observations of the various witnesses, to disbelieve Fairhead and his assertion that he terminated

Garcia on the basis of the solder inconsistency—a credibility determination that is reasonable.[2] *See Tart*, 366 F.3d at 472 (court must be "particularly careful in employment discrimination cases to avoid supplanting [its] view of the credibility or weight of the evidence for that of the jury") (citing *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1054 (7th Cir. 1990)).

All told, "the jury heard evidence from which it could infer pretext[, and] just because [Sigmatron] articulated a non-discriminatory reason, the jury did not have to believe it." *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 633 (7th Cir. 1996). Sigmatron relies entirely on the argument that the evidence *could only* show that its asserted rationale for firing Gracia was perfectly legitimate.[3] As explained,

---

[2] As much as Sigmatron argues how "critical" it was to the company to meet customer specifications on solder-types without fail, to say that this assertion was "uncontroverted" is simply inaccurate. R. 202, Def.'s Reply Br. at 5. Trujillo, Murphy, and Gracia all controverted it, and directly so. Sigmatron is also incorrect to assert that it was error for the jury to have "simply disbelieved" Fairhead. *Id.* "It is the prerogative of a jury or other trier of fact to disbelieve uncontradicted testimony unless other evidence shows that the testimony *must* be true." *E.E.O.C. v. G-K-G, Inc.*, 39 F.3d 740, 746 (7th Cir. 1994). No evidence was presented to establish that Fairhead's version of his motivation had to be true. Moreover, Fairhead's testimony *was* contradicted, giving the jury ample basis to disbelieve him.

Accordingly, the parties' brief sparring over whether Gracia could prove retaliatory motive on a "cat's paw theory"—that is, whether Fairhead unwittingly acted as the conduit for another employee's (namely, Silverman's) unlawful motive—is not a necessary basis for decision here. *See* R. 200, Pl.'s Resp. Br. at 4-5; *see also Lust v. Sealy, Inc.*, 383 F.3d 580, 584 (7th Cir. 2004) (suggesting that "cat's paw" formula might be "inconsistent with the normal analysis of causal issues in tort litigation"). Contrary to Sigmatron's assertion, Def.'s Reply Br. at 12, the jury did have reason to doubt Fairhead's credibility and impute that he himself had been motivated by retaliation.

[3] In its reply brief, Sigmatron claims that Gracia somehow admitted in her response brief that she could not prove a retaliation claim by the *McDonnell Douglas* "indirect" method of proof, and that there was insufficient evidence at trial to prove her claim by the direct method. Def.'s Reply Br. at 1-4. Sigmatron spins its wheels in an irrelevant detour. The direct/indirect proof analysis applies at the initial, pre-trial stage of determining whether a prima facie case exists. *See, e.g., U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 713-14 (1983). "It is well-established in this circuit that the burden-shifting

5

that is not the case. Accordingly, Sigmatron's motion for judgment as a matter of law is denied.

## II. Motion for New Trial

Sigmatron moves in the alternative for a new trial under Rule 59(a). "A court may only order a new trial if the jury's 'verdict is against the manifest weight of the evidence, ... or if for other reasons the trial was not fair to the moving party.'" *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) (quoting *Marcus & Millichap Inv. Servs. v. Sekulovski*, 639 F.3d 301, 313 (7th Cir. 2011)). "In ruling on a motion for a new trial, the judge may consider the credibility of witnesses, the weight of the evidence, and anything else which justice requires." *Bob Willow Motors, Inc. v. Gen. Motors Corp.*, 872 F.2d 788, 798 (7th Cir. 1989) (citation omitted).

In seeking a new trial, Sigmatron points mainly to the same arguments made in support of its motion for judgment as a matter of law. Def.'s Br. at 9-10. As already discussed, these arguments are not convincing, even applying the less verdict-favoring standard of review for new-trial motions. The jury's determination that Sigmatron and Fairhead's explanation for firing Gracia was pretextual was not against the manifest weight of the evidence, in light of the contradictory testimony offered not only by Gracia, but other company employees, namely, Trujillo and

---

methodology should not be used during the jury's evaluation of evidence at the end of a trial on the merits: … the only remaining question—the only question the jury need answer—is whether the plaintiff is a victim of intentional discrimination [or retaliation]." *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1350 (7th Cir. 1995) (citation omitted). Sigmatron asserts that Gracia failed to prove such retaliation, but in support of that contention merely repeats its flawed assertions that its evidence about the proffered reason for Gracia's termination was "uncontroverted." Def.'s Reply Br. at 5-9. Sigmatron offers no other basis to question the evidence supporting the inference that it was motivated by a desire to retaliate against Gracia when it fired her.

Murphy. As a final resort, Sigmatron also identifies instances of inconsistency between the three that it says "effectively diminished" their credibility and revealed they were "not truthful" and "incredible." Def.'s Reply Br. at 9-13. This kitchen-sink attack is not persuasive.

First, Sigmatron misunderstands the thrust of some of the testimony it highlights. For instance, Sigmatron asserts that Trujillo and Gracia contradicted each other about how often the mis-soldering took place, *id*. at 10, but in fact, they were materially consistent on the issue. Even if Gracia declined to characterize the frequency as "often" as Trujillo did, both testified that it occurred at least from time to time. *See* Trial Tr. at 463, 557-59. Indeed, on that basis alone, the jury could deem not credible Sigmatron's insistence that it took the solder-issue seriously enough to punish Gracia. Additionally, Sigmatron attacks Murphy's credibility because he testified about "how things were done before Mr. Fairhead served as Sigmatron's Director of Operations." Def.'s Reply Br. at 12. This assertion is not entirely accurate: Murphy testified about his knowledge of Sigmatron's solder practices throughout his period of employment, 2006 to 2008, which extended into Fairhead's tenure as director of operations, which began in 2007. *See* Trial Tr. at 396, 541. In any event, Sigmatron's attitude about solder practices even before Fairhead took over was a relevant topic, even if Murphy's testimony had been limited to that period. If there was rampant mis-soldering before Fairhead took over, and the mis-soldering was as serious as he said it was, then it would be

7

expected that Trujillo or Murphy would have testified about a sea change in the practice and its consequences. There was no such testimony.

Where Sigmatron does identify some actual inconsistencies in testimony, the effect is not nearly as consequential as it argues. Gracia stated that Trujillo raised the matter of the improper soldering with her on the day of its discovery, while Trujillo testified he "could not recall" the specific conversation (though, again, there was no testimony from them conceding that Gracia showed a cavalier attitude toward it), *compare id.* at 502 *with id.* at 568; and Trujillo initially testified that he did not speak with supervisor Silverman about Gracia's job in the two months before her termination, then said that Silverman had warned him to stay away from her because she was being targeted, "about a month" before her firing, *id.* at 558, 560. These inconsistencies concern relatively minor details and Sigmatron does not show how they rise to a level of being so problematic as to make the witnesses fundamentally unbelievable. They simply do not undercut the main thrust of Gracia, Trujillo, and Murphy's testimony, which as a whole suggested that Fairhead's account of purported meetings and conversations with Trujillo and Silverman in response to the solder mistake was not credible.

Finally, Sigmatron labels Gracia as "not worthy of belief" because she did not produce documentary proof at trial about the harassing communications she claimed she received and because she was late in forwarding offensive emails and complaining. Def.'s Reply Br. at 11. This line of attack does not come close to the new-trial standard even though the Court is free to reweigh evidence.. Whatever

8

impact those arguments have on Gracia's underlying *harassment* claim, Sigmatron fails to connect the arguments to the *retaliation* claim. Sigmatron offers no explanation for how the arguments impact Gracia's (and Murphy's and Trujillo's) testimony refuting Sigmatron's proffered explanation for the firing, and the proof of pretext readily supported the finding of retaliation.

In sum, Sigmatron's effort to cast doubt on the credibility of unfavorable witnesses is meritless. The jury was presented with the minor inconsistencies (to the extent there really were inconsistencies) that Sigmatron relied on, but rejected the arguments. In light of the overall consistency of Gracia, Trujillo, and Murphy's testimony and the problems with Fairhead's own testimony, Sigmatron has not presented any basis to ignore the "respect for the collective wisdom of the jury." *Mejia v. Cook Cnty., Ill.*, 650 F.3d 631, 633 n.1 (7th Cir. 2011) (citation omitted). Because the jury's finding was not against the manifest weight of the evidence, a new trial is not warranted.

### III. Motion for Remittitur

Finally, Sigmatron moves for a remittitur of the compensatory and punitive damages awards, arguing that they are excessive and unjustified. Def.'s Br. at 10-14. To start, Gracia does not dispute Sigmatron's assertion that a statutory cap of $50,000 applies to her compensatory damages award, necessitating a reduction from the $57,000 awarded by the jury. *Id.* at 10; Pl.'s Resp. Br. at 9. *See* 42 U.S.C. § 1981a(b)(3).[4] However, this reduction is all that is appropriate.

---

[4]The statute caps total compensation, including compensatory and punitive damages, at $300,000 for an employer that has more than 500 employees. Sigmatron

## A. Compensatory Damages

First, the compensatory damages award must be weighed with "several considerations in mind: (1) whether the award is 'monstrously excessive'; (2) whether there is no rational connection between the award and the evidence; and (3) whether the award is roughly comparable to awards made in similar cases." *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 408 (7th Cir. 2010) (citing *Marion County Coroner's Office v. E.E.O.C.*, 612 F.3d 924, 931 (7th Cir. 2010)). The "monstrously excessive inquiry" is "simply … another way of asking whether there is a rational connection between the award and the evidence." *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 714 (7th Cir. 2004) (citation omitted). Here, an award of $50,000 passes muster.

Sigmatron argues that a remittitur to zero is warranted because the only evidence supporting the extent of Gracia's emotional injury was her testimony that she was "just depressed." Def.'s Br. at 12 (citing Trial Tr. at 493). It is well-accepted, however, that "[a]n award for nonpecuniary loss can be supported, in certain circumstances, solely by a plaintiff's testimony about his or her emotional distress." *Tullis v. Townley Eng'g & Mfg. Co.*, 243 F.3d 1058, 1068 (7th Cir. 2001) (citing *Merriweather v. Family Dollar Stores of Ind., Inc.*, 103 F.3d 576, 580 (7th Cir. 1996)). "It is within the jury's province to evaluate the credibility of witnesses who

---

appears to concede that it falls into this category. The jury's award to Gracia totaled $307,000. The parties agree that the applicable reduction to fit the cap should be made to the compensatory damages portion of the award. The Court will follow the parties' preference.

10

testify to emotional distress, and [the courts] shall not disturb those credibility determinations[.]" *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857 (7th Cir. 2001).

To be sure, Gracia did not use many words when describing the emotional impact of being fired in retaliation for reporting alleged harassment. *See* Trial Tr. at 483 ("It was hard. I was just depressed. I have always been used to working."). But not all plaintiffs necessarily possess trial-ready, free-flowing eloquence or speak with a vocabulary that lends itself to legal briefs—especially on a subject that is as difficult to articulate and fraught with stigma as the extent and effects of emotional distress. Indeed, that is one reason to emphasize the importance on the jury's role to observe and weigh live, in-court testimony of witnesses, first-hand. Here, the jury, "as seen by the amount they awarded" Gracia, "must have not believed that [she] needed to show that [she] sought the help of psychologists or friends for [her] emotional distress" and did not need "more detail about either [Gracia's] emotional distress or the inconvenience that [she] experienced." *Tullis*, 243 F.3d at 1068 ("The jury was able to observe [the plaintiff] when [she] was testifying and they apparently found [her] testimony to be sincere and sufficient to convince them that [she] merited the award they gave [her]."). Indeed, the jury could have considered the impact on Gracia through the lens of other testimony (indeed, her lawyer's closing argument emphasized this)—that she had worked continuously since the age of 16, had been a "spectacular" employee during her time at Sigmatron, and after her termination was without work despite her efforts to find another job for 16 months during the recession, *see* Trial Tr. at 166, 289, 428-30—to find that the

11

distress and inconvenience to her of losing a valued job "were not minor events." *Tullis*, 243 F.3d at 1068-69 (award not monstrously excessive and rationally connected where jury assessed plaintiff's credibility in light of other evidence of disruptions to life).

The jury's award is also roughly comparable to other Title VII awards. The cases on which Sigmatron relies do not suggest otherwise. In *David v. Caterpillar, Inc.*, for instance, the district court cut compensatory damages from $100,000 to $50,000 for a plaintiff who described feeling depressed and "cheated" by a discriminatory *failure to promote*; in other words, providing for an award for the same amount at stake here to an employee who, unlike Gracia, at least retained her job. 185 F. Supp. 2d 918, 923-24 (C.D. Ill. 2002) (noting plaintiff presented no evidence of counseling or sustained period of depressive symptoms) *aff'd*, 324 F.3d 851 (7th Cir. 2003). Sigmatron cites *Avitia v. Metro. Club of Chicago, Inc.*, where the Seventh Circuit reduced a jury's award of $21,000 to a fired plaintiff by half, deeming the $21,000 award too much for what the opinion called "a moment's pang of distress." 49 F.3d 1219, 1227 (7th Cir. 1995). But here the jury could reasonably conclude that the distress suffered by Gracia was not as fleeting as a "moment's pang." The Seventh Circuit also granted a remittitur from $200,000 to $20,000 in *Marion County Coroner's Office v. E.E.O.C.*, in the case of a deputy coroner fired in retaliation for an internal complaint. 612 F.3d 924, 931 (7th Cir. 2010) (reviewing award set by administrative law judge, not jury). The lower damages award in that case is also distinguishable in part, however, because the plaintiff there had been

working elsewhere part-time, *id.* at 926-27, whereas Gracia's sole employment was with Sigmatron.

In any event, it must be remembered that "[a]wards in other cases provide a reference point that assists the court in assessing reasonableness[,] … they do not establish a range beyond which awards are necessarily excessive. Due to the highly fact-specific nature of Title VII cases, such comparisons are rarely dispositive." *Lampley v. Onyx Acceptance Corp.,* 340 F.3d 478, 485 (7th Cir. 2003), *cert. denied,* 540 U.S. 1182 (2004). Ultimately, a $50,000 award is in line with a range set by Seventh Circuit precedent and reflective of the distress described, which the jury determined to be real (if not particularly long-lasting or accompanied by articulable physical ailments). *See, e.g., Tullis,* 243 F.3d at 1067-68 (upholding $80,000 in emotional distress damages where plaintiff felt "degraded" and "backstabbed"); *Deloughery v. City of Chicago,* 422 F.3d 611, 620 (7th Cir. 2005) (setting $175,000 award for mental suffering to "highly motivated" employee denied promotion); *Harvey v. Office of Banks & Real Estate,* 377 F.3d 698, 714 (7th Cir. 2004) ("the jury could have reasonably concluded that awards in the range of $50,000 to $150,000 were necessary" where plaintiffs complained of continuing mental and physical ailments, frustration at being passed over for promotion). Accordingly, the Court finds no reason to reduce the award for compensatory damages any further than required by the statutory cap, that is, to $50,000.

## B. Punitive Damages

The final issue to be addressed is whether the jury's award of $250,000 in punitive damages ought to be reduced, which Sigmatron appears to urge on constitutional grounds. Def.'s Br. at 12-13. The Supreme Court has explained that, in cases at common law, due process "prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003); *see also BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). Specifically, there are "three guideposts to determine whether a punitive damage award is grossly excessive such that it offends due process: (1) the degree of reprehensibility of defendant's conduct; (2) the disparity between the harm or potential harm suffered by the plaintiff and his punitive damages award; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Kapelanski v. Johnson*, 390 F.3d 525, 534 (7th Cir. 2004) (citing *Gore*, 517 U.S. at 575).

As Gracia hints, Pl.'s Resp. Br. at 10, due-process concerns over punitive damages, while still applicable even outside common-law trials, have less thrust in the context of a Title VII award. As the Ninth Circuit recently observed, "[a]n exacting *Gore* review, applying the three guideposts rigorously, may be appropriate when reviewing a common law punitive damages award. However, when a punitive damages award arises from a robust statutory regime [like Title VII], the rigid application of the *Gore* guideposts is less necessary or appropriate." *Arizona v. ASARCO LLC*, 773 F.3d 1050, 1056 (9th Cir. 2014) (*en banc*). Part of this eased

approach is the clear notice that Title VII affords potential violators on their possible exposure in punitive damages, which are statutorily capped. *See* 42 U.S.C. § 1981a(b)(3); *see also Lust*, 383 F.3d at 590-91 ("The purpose of placing a constitutional ceiling on punitive damages is to protect defendants against outlandish awards[.] … That purpose falls out of the picture when the legislature has placed a tight cap on total, including punitive, damages and the courts honor the cap.").

Sigmatron argues that a remittitur to zero is appropriate because its actions were not particularly egregious, insisting that Fairhead fired Gracia because he believed she had violated customer specifications. Def.'s Br. at 13-14. But as discussed at length already, the jury (supported by sufficient evidence) reasonably rejected that story as pretense—in other words, a lie offered to obscure the fact that the company fired Gracia in retaliation after she complained of what she believed to be unlawful treatment. It is true that the facts here do not rise to level of the most shocking cases of retaliatory behavior out there. *See, e.g.*, *Neal v. Honeywell, Inc.*, 191 F.3d 827, 832 (7th Cir. 1999) (manager made threats of physical injury in addition to retaliatory discharge). But Sigmatron is wrong to argue that its behavior (as the jury found it) was so innocuous as to merit nothing in punitive damages. *See Kolstad v. American Dental Ass'n,* 527 U.S. 526, 533 (1999) (rejecting argument that punitive damages only available in "extraordinarily egregious" cases). Even without other facts in aggravation, the mere act of retaliatory discharge, followed up by an effort to hide it using the kind of false (again, as the jury found) paper trail a

company can create, is the kind of insidious conduct long targeted by civil-rights laws like Title VII. Indeed, the jury could infer, and apparently did, from the conflicting testimony that Fairhead went so far as to manufacture details of reports and meetings involving Trujillo and other managers, in an effort to justify the company line for why Gracia was fired. The jury could further take into account that it was a company vice president—upper management—who was involved in such behavior to send the punitive message that it did.

With all this in mind, the jury's punitive award is appropriate. "The judicial function is to police a range, not a point." *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 678 (7th Cir. 2003). And a punitive damages award that is five times the amount of the compensatory damages is well within the range covered by precedent. *See, e.g.*, *Kapelanski*, 390 F.3d at 534 (3.3 to 1 ratio "easily permissible"); *Mathias*, 347 F.3d at 678 (affirming 37 to 1 ratio); *Lampley*, 340 F.3d at 485-86 (punitive damages of $270,000 compared to $30,000 in compensatory damages, or ratio of 9 to 1, would be acceptable). *But see David*, 185 F. Supp. 2d at 927 (finding 5 to 1 ratio "problematic" in retaliation case and setting treble punitive damages).[5] The Supreme Court has noted that "few awards *exceeding a single-digit ratio* between punitive and compensatory damages, to a significant degree, will satisfy due process," *State Farm*, 538 U.S. at 410 (emphasis added), and the jury's award does not approach that suspect order of magnitude. The Court will respect the jury's

---

[5]Sigmatron cites to *Hiatt v. Rockwell Int'l Corp.*, but that case is inapposite, dealing with Illinois law standards for when punitive damages may be imposed at all in the context of retaliatory discharge for pursuing worker's compensation rights. 26 F.3d 761, 766 (7th Cir. 1994).

16

within-reason determination of the appropriate punitive message based on the jury's review of the evidence. *See Lampley*, 340 F.3d at 486 ("Reflecting our general deference to jury verdicts, we have never required the district court to adjust a jury's punitive damages verdict so that it is proportional, in the court's view, to the defendant's wickedness. Such proportional adjustments are left to the jury itself.") (quoting *Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1028 (9th Cir. 2000)); *see also Fine v. Ryan International Airlines*, 305 F.3d 746, 755 (7th Cir. 2002) ("But these cases are fact-specific, and we have made it clear that we will not normally disturb an award of damages in a Title VII case at or under the statutory cap, as this decision is largely within the province of the jury.") (citation and internal quotation marks omitted)). The punitive damages award will not be disturbed.

## IV. Conclusion

As discussed above, Sigmatron's motions for judgment as a matter of law and a new trial are denied. Its motion for remittitur is granted only to the extent that the jury's award is adjusted to respect the statutory cap of $300,000, so that the final result is $50,000 in compensatory damages and $250,000 in punitive damages.

In view of the denial of the Rule 50 and Rule 59 motions, the next step is to determine equitable relief: back pay, lost benefits, and front pay (if any). The parties shall confer on whether an in-court evidentiary hearing is required, or whether instead they believe that a briefing will suffice. The parties shall file a joint status report explaining their positions by April 28, 2015. The status hearing of May 8, 2015 is reset to May 1, 2015 at 9 a.m.

Finally, the parties are strongly encouraged to engage in settlement negotiations. The jury has spoken, and the defense should recognize the uphill climb required to overturn any jury verdict. Sigmatron took the risk (understandably but, ultimately, mistakenly) that the jury would credit Fairhead and Silverman over Gracia and Trujillo—but the jury went the other way. And Murphy's testimony too ended-up in Gracia's favor (it does not appear that Murphy was deposed). The jury could reasonably rely on the evidence to find retaliation, and they did. At the same time, Gracia must recognize that the litigation could go on and on, even after the jury verdict. It is time to seriously discuss settlement. The status report to be filed on April 28, 2015 shall also report on the state of settlement negotiations.

ENTERED:

      s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: April 21, 2015