MARIA N. GRACIA,          )
                                   )
        Plaintiff,       )     No. 11 C 07604
                                   )
        v.               )
                                   )     Judge Edmond E. Chang
SIGMATRON INTERNATIONAL, INC.  )
                                   )
        Defendant.    )
                                   )

## MEMORANDUM OPINION AND ORDER

Following a trial in December 2014, a jury found that Defendant Sigmatron International, Inc. had unlawfully retaliated against Plaintiff Maria Gracia by firing her in December 2008 after she complained about workplace discrimination, in violation of Title VII of the Civil Rights Act of 1964.[1] The jury awarded Gracia $57,000 in compensatory damages (later lowered to $50,000 by the Court on remittitur to comply with a statutory cap) and $250,000 in punitive damages. *See Gracia v. Sigmatron Int'l, Inc.*, — F. Supp. 3d —, 2015 WL 1841407 (N.D. Ill. Apr. 21, 2015) (denying any further remittitur and Sigmatron's motions for judgment as matter of law and new trial). Gracia now seeks equitable relief, including back pay; lost benefits like retirement contributions, medical insurance, and

---

[1]The Court has subject matter jurisdiction over this federal-question case under 28 U.S.C. § 1331. Citations to the docket are "R." followed by the entry number and, when necessary, the page/paragraph number.

vacation/personal time; prejudgment interest; and a tax offset. *See* R. 208, Pl.'s Claim for Equitable Relief.

The parties agreed to submit the equitable-damages issues on documentary submissions, without an evidentiary hearing. *See* R. 205, Parties' Joint Status Report dated 04/28/2015. The Court therefore draws on such submissions, including affidavits and tax documents, as well as testimony from the trial and pre-trial depositions, for any necessary findings of fact, as noted throughout the discussion below. Gracia asks for an award of $107,835.46 in equitable relief, not including prejudgment interest. Pl.'s Claim at 3. Sigmatron urges the Court to deny any claim to equitable relief based on Gracia's alleged failure to mitigate damages or, in the alternative, to award $54,774.51. R. 210, Def.'s Resp. at 11-12. For the reasons that follow, the Court finds that Gracia is entitled to $74,478.14.

Also pending before the Court is a motion that Sigmatron filed during the course of the trial, seeking sanctions under Federal Rule of Civil Procedure 37(c)(1) against Gracia for displaying modified exhibits to the jury without giving proper notice. R. 170, Mot. Sanctions. As explained below, that motion is denied.

## I. Legal Standard for Equitable Relief

Under Title VII, after an employer has been found to have intentionally engaged in an unlawful employment practice, the district court may order back pay, reinstatement, and "any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g)(1). If reinstatement is inappropriate, a court can award front pay. *Williams v. Pharmacia*, 137 F.3d 944, 952 (7th Cir. 1998) ("As the equivalent of

reinstatement, front pay falls squarely within the statutory language [of § 2000e-5(g)(1)] authorizing 'any other equitable relief.'"). Front pay represents the wages the plaintiff would have earned had she not been fired measured from the date of the judgment to some reasonable point in the future. *See McKnight v. General Motors Corp.*, 908 F.2d 104, 116 (7th Cir. 1990). Back pay, on the other hand, represents the wages the plaintiff would have earned had she not been fired between the time of the firing and the date of judgment. *See* 7th Cir. Pattern Civil Jury Instruction 3.11 (2015). Because both are equitable remedies, any award of back pay and front pay is to be decided by the court, rather than a jury. *See David v. Caterpillar, Inc.*, 324 F.3d 851, 865 (7th Cir. 2003) ("The district court has broad equitable discretion to fashion back pay awards to make the Title VII victim whole."); *Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 499-501 (7th Cir. 2000) ("Back pay and front pay are equitable remedies … and therefore matters for the judge."); *Williams*, 324 F.3d at 951-52 (approving district court's conclusion that front pay is an equitable remedy and a matter for the court to decide). "The district court has broad equitable discretion to fashion back pay awards to make the [discrimination] victim whole." *David*, 324 F.3d at 865.

## II. Application of Equitable Relief

Gracia seeks neither reinstatement to her former position at Sigmatron nor front pay, that is, wages she would have made going into the future had she not been illegally fired. Pl.'s Claim at 2; *see also* Gracia Decl. ¶¶ 10-11. Indeed, as explained below, she now makes more at her new job. Her request for relief instead

consists of back pay, the value of certain back and projected future benefits (which she would have received at Sigmatron but are not available at her new work), a tax offset, and prejudgment interest. The Court addresses each in turn.

## A. Back Pay

### 1. Presumption of Award

Once the jury has found that there has been employment discrimination, there is a presumption that the employee is entitled to back pay. *See David*, 324 F.3d at 865; *E.E.O.C. v. Gurnee Inn Corp.*, 914 F.2d 815, 817-18 (7th Cir. 1990). The claimant must establish the amount of damages, but she is presumptively entitled to full relief. *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994); *Gurnee Inn*, 914 F.2d at 817-18; *see also Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 847-48 (2001) (holding that back pay includes lost benefits); *EEOC v. O'Grady*, 857 F.2d 383, 391 (7th Cir. 1988) (same). "Once a plaintiff has established the amount of damages she claims resulted from her employer's conduct, the burden of going forward shifts to the defendant to show that the plaintiff failed to mitigate damages or that damages were in fact less than the plaintiff asserts." *Hutchison*, 42 F.3d at 1044; *accord Taylor v. Philips Indus., Inc.*, 593 F.2d 783, 787 (7th Cir. 1979) (holding that it is "[n]ot until the plaintiff establishes what she contends are her damages [that] the burden of going forward to rebut the damage claim or to show plaintiff's failure to mitigate damages, fall on defendant").

## 2. Duty to Mitigate

Sigmatron argues that Gracia is not entitled to back pay because she failed to mitigate her damages by failing to be reasonably diligent in finding another job after her firing. Def.'s Resp. at 3-4. Sigmatron further contends that Gracia "willfully incurred" losses by choosing to take care of her nephew (allegedly in exchange for room and board), thus foreclosing opportunities to mitigate damages in higher-paying jobs. *Id*. at 4-5. Failure to mitigate, however, is an affirmative defense and Sigmatron has not met its burden of establishing it.

Generally, "a discharged employee must mitigate damages by using reasonable diligence in finding other suitable employment." *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1202 (7th Cir. 1989) (internal quotation marks and emphasis omitted). Any back-pay award to a victim of discrimination must therefore be reduced by "[i]nterim earnings and amounts earnable [by the employee] with reasonable diligence." 42 U.S.C. § 2000e-5(g)(1). Because the statutory text requires subtracting not only actual "interim earnings" but also amounts "earnable with reasonable diligence," a plaintiff "cannot just leave the labor force after being wrongfully discharged in the hope of someday being made whole by a judgment," *Hutchison*, 42 F.3d at 1044. Nor will a lack of job-seeking success excuse the plaintiff from this duty to mitigate. A plaintiff's "discouragement [may be] understandable, and his lack of success [may be] regrettable, but his duty to mitigate [does] not evaporate in the face of his difficulties." *Payne v. Security Saving and Loan Assoc.*, 924 F.2d 109, 111 (7th Cir. 1991). Although the duty to

mitigate falls on the plaintiff, *see Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982), it is the *employer*'s burden to establish that the plaintiff failed to mitigate his damages, *see Hutchison*, 42 F.3d at 1044. "To establish the affirmative defense of a plaintiff's failure to mitigate damages, the defendant[ ] must show that: (1) the plaintiff failed to exercise reasonable diligence to mitigate her damages, and (2) there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence." *Id.*; *accord Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1234 (7th Cir. 1986).

Sigmatron contends that Gracia waited ten months after her firing before sending out emails about jobs, and then only infrequently emailed prospective employers without even including any cover letters or introductions. Def.'s Resp. at 3-4 (citing chart of Gracia's job-seeking efforts). If that were right, then Sigmatron likely would have carried its burden to show lack of reasonable diligence. But there is no need to definitively decide that issue, because Sigmatron does not make even a perfunctory effort to meet the second element of its affirmative defense: namely, that there was a reasonable chance there was comparable work to be found. The Seventh Circuit has held that an employer "must prove *both* that the claimants were not reasonably diligent in seeking other employment, *and* that with the exercise of reasonable diligence there was a reasonable chance that the claimants might have found comparable employment." *Gurnee Inn*, 914 F.2d at 818 (internal alterations and quotation marks omitted) (emphasis in original); *see also United States v. City of Chicago*, 853 F.2d 572, 578 (7th Cir. 1988); *Wheeler*, 794 F.2d at

1234. Sigmatron offers *no* evidence on the availability of work comparable to her lost position in the months after her discharge. For instance, Sigmatron could have submitted evidence about Gracia's application process with her new employer (she got that job in 2010), such as how long the position was open when she applied (and how many positions of that type were open at the new employer), and how quickly she was able to secure that position, to create *some* circumstantial basis to think that comparable work was available to her had she looked sooner. Or Sigmatron could have introduced Bureau of Labor Statistics studies for manufacturing jobs in Illinois for the relevant time period. But Sigmatron submitted no evidence on this point, so it has failed to meet its burden. It bears remembering that it is appropriate to place the burden of proof on the employer to tamp-down damages because the only reason why this question needs an answer is that the *employer* has engaged in illegal discrimination.

It also bears noting that Sigmatron's other contention—that Gracia took herself out of the job market by taking care of her nephew—is undeveloped and likely wrong. At trial, Gracia testified that, after she was fired, she stayed at her sister's apartment, where the rent was paid by her sister, and provided some care for her sister's son. R. 191, Trial Tr. at 494. Sigmatron urges a reduction in Gracia's back pay based on the value of the "free room and board" Gracia received from her sister. Def.'s Br. at 5. There are a couple of problems with this argument. The company provides no factual basis to assume that Gracia's in-family childcare constituted the equivalent of work that consumed an amount of time that prevented

a diligent search for employment. Even if it had, Sigmatron ignores that a plaintiff must find comparable work to what she has unlawfully lost, and "need not seek employment which is not consonant with his particular skills, background, and experience." *Graefenhain*, 870 F.2d at 1202 (citation and internal quotation marks omitted). In any event, Sigmatron also provides no authority for the proposition that a defendant found liable for a discriminatory firing can seek to reduce its damages to an unlawfully-fired employee by deducting the value of living expenses that the employee, now cut off from her wages, necessarily tries to save by relying on family. All in all, Sigmatron has failed to carry its burden.

### 3. Calculation

### a. 2008 Earnings as Benchmark

With the mitigation defense rejected, the Court turns to the calculation of Gracia's back pay. As a threshold matter, the parties dispute the applicable figure that should serve as the benchmark for the wages Gracia lost due to the retaliatory firing. Gracia urges that her annual earnings for the last complete calendar year she worked, 2007, a sum just over $36,000, be used to determine what she would have continued to make on the job. Pl.'s Claim at 3. Sigmatron counters that Gracia's 2008 earnings (projected for the full year, because she was fired a few weeks shy of the end of December), which are lower, constitute the proper figure. Def.'s Resp. at 6. Sigmatron has the better argument.

Back pay is "the difference between actual earnings for the period and those which she would have earned absent the discrimination by defendant." *Horn v.*

*Duke Homes, Div. of Windsor Mobile Homes, Inc.*, 755 F.2d 599, 606 (7th Cir. 1985). Calculating the difference in pay is "not an exact science," ultimately resting on "a process of conjectures" that are necessarily "imprecise." *Thompson v. Altheimer & Gray*, 2001 WL 1618717, at *2 (N.D. Ill. Dec. 18, 2001) (citations omitted). The process is somewhat simpler in this case, because Gracia does not make any arguments about hypothetical raises she might have received moving forward. Instead, she merely wants to apply the same annual-earnings figure for later years, until she began to earn more at her current job. Pl.'s Claim at 3. That is perfectly acceptable, but she offers no reason to use 2007 (rather than 2008) as the benchmark, aside from the argument, unsupported by any law, that it was the last full calendar year of employment. Not surprisingly, Gracia prefers 2007 because she made more that year (as the calculations below show), but there is more current wage information available, for virtually all of 2008, specifically, through December 7 of that year. *See* R. 209, Exh. A, Earnings Stmt. for 12/01 to 12/07/2008. It is easy enough to determine what full-year earnings would have been for 2008, a year that better reflects Gracia's projected work hours and pay going forward than a previous year.[2] *See* R. 209, Gracia Decl. ¶ 2 (stating that Gracia was paid based on an hourly

---

[2]Gracia argues that using 2007 avoids "the need to speculate" because she believes that she would have earned overtime in late 2008 had she not been fired. R. 214, Pl.'s Reply Br. at 8 (citing Gracia Affidavit ¶ 12). But Gracia raised this overtime possibility for the first time in the reply brief, rather than developing an opening argument as to why 2007 was the right year to use. And an examination of Gracia's affidavit really shows that she is speculating about the possible overtime. She avers that, on August 1, 2008, Patrick Silverman told her and others that Sigmatron had committed to shipping an order to Honeywell by January 19, 2009. Gracia opines that this order probably would have required significant overtime during late December 2008. But the information about the Honeywell order was shared with Gracia more than four months before early December

rate, not set salary). Gracia's final pay stub lists $31,609.15 as her gross pay through December 7, *see* Earnings Stmt.; projecting her earnings for the remaining 24 days of the year at the same rate, as Sigmatron urges, Def.'s Resp. at 6, the resulting sum is $33,776.63.

### b. Interim Earnings

The next step is to consider any interim earnings, that is, "wages (or the like) earned by a discriminated upon employee in the period after his discharge but before judgment that, but for the discrimination, would not have been earned." *Chesser v. State of Ill.*, 895 F.2d 330, 337 (7th Cir. 1990). Interim earnings "operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g)(1). To start, Sigmatron re-raises the fact that Gracia lodged with her sister after her firing. Pl.'s Resp. at 7-8. The company relies on a district court case that found that a discharged discrimination plaintiff who took a second, non-salaried job as a caretaker for an elderly woman for room and board should have such "in-kind compensation for services rendered" included as interim earnings. *E.E.O.C. v. Fotios*, 671 F. Supp. 454, 457 (W.D. Tex. 1987). *Fotios* is not the same as this case. The eldercare job the plaintiff in that case took was precisely that—a part-time job taken as an afterhours supplement to a 40-hour post. *Id*. at 456. All that the record shows for Gracia, by contrast, is that, having been fired illegally by Sigmatron, she

---

2008, yet Gracia offers nothing more to establish that the order was still on track (for example, she offers nothing about preparations as of early December 2008, when she was still at Sigmatron, to work on the order). Nor does Gracia provide any details about the Honeywell order to establish that overtime would be needed (and how much), even if the January 19, 2009 ship-date was still in place. Ultimately, this argument is too undeveloped to credit.

did what many might do when faced with a sudden financial shortage: she moved in with an immediate family member, providing some care for her sister's son when living there. Indeed, Gracia attests that rather than benefit from free room, she cashed out her 401(k) to contribute something in rent to her sister. Gracia Supp. Decl. ¶ 6. Sigmatron points to nothing in the record to show that Gracia's informal, within-family babysitting rose to the level of employment (in terms of hours, compensation, and so on) such that is would constitute a job that generated "earnings." What's more, Sigmatron offers inadmissible evidence in an attempt to place a value on the lodging, proffering real-estate listings from the internet, *see* Def.'s Resp., Exh. 6, for a one-bedroom apartment in the area of Chicago where Gracia stayed with her sister. Aside from the inadmissibility of the listings, no explanation is provided to support using the value of an entire one-bedroom apartment (there is no reason to believe that Gracia had her own kitchen, living room, and so on).

There is, however, some evidence of other interim earnings in the record. First, during her pretrial deposition, Gracia testified that in 2009 she had worked as a translator, receiving $50 for the one-off job. R. 210, Exh. 7, Gracia Tr. at 25-26. That amount shall apply as interim earnings. Second, in her declaration submitted in support of equitable relief, Gracia states that, also in 2009, she worked for a used furniture business, earning $700 according to her best estimate (she was paid in cash and no record was kept of the amount). Gracia Decl. ¶ 7. Sigmatron criticizes Gracia for hiding the existence of this work until this stage of post-trial litigation.

Def.'s Resp. at 8-9. In response, Gracia explains that she did mention this work during her deposition and that Sigmatron only confuses it now as a new job altogether because during her 2012 deposition she had stated, as her then-memory of her pay, a sum of around $400, as opposed to the $700 she lists now. *See* R. 215, Gracia Supp. Decl. ¶ 16. It does appear that Gracia did acknowledge the used-furniture work in the deposition testimony Sigmatron cites. Gracia Tr. at 23-24 (discussing working for "probably like a week" for a company that bought and resold old furniture).[3] Although Gracia now wishes to apply the lesser amount as the interim-earnings figure, Pl.'s Reply Br. at 8, the Court will hold her to the $700 she provided in her affidavit, which was presumably based on careful consideration for the specific purpose of reconstructing her income history (as opposed to the off-the-cuff response she appears to have given at her deposition). Accordingly, the Court will offset Gracia's back-pay award for 2009 by a total of $750.

Next, and most significantly, Gracia's back-pay award must take into consideration her earnings from a new job she obtained in 2010, at a company called Imagineering, Inc. Gracia Decl. ¶ 8. According to W-2s submitted by Gracia, these earnings amounted to $20,016 in 2010 and $30,183 in 2011. *See* Gracia Decl., Exhs. E and F, W-2 for 2010 and 2011. Finally, because Gracia earned over $34,000 in 2012, *see id.*, Exh. G, W-2 for 2012, the last year for which she has provided tax

---

[3]Sigmatron suggests that Gracia's "lack of credibility regarding her back pay warrants a complete denial of her claim for such relief." Def.'s Resp. at 9. There is no basis for such an extraordinary step, premised solely on a discrepancy of $300 on how much Gracia made on an informal job lasting one or two weeks several years ago, a discrepancy that Gracia now acknowledges.

documents, an amount more than what her earnings would have been at Sigmatron, calculation of her back-pay award ends with calendar-year 2011.

### c. Resulting Award

Using the amounts decided above, the chart below shows the back-pay calculation. Remember that the annual earnings that Gracia would have made had she not been fired were $33,776.63, based on her projected full-year 2008 wages.

| Year | Earnings | Difference Owed |
|------|----------|-----------------|
| **2008** | $31,609.15 (through Dec. 7) | $2,167.48 (rest of year) |
| **2009** | $750.00 ($700 from furniture work, $50 from translating) | $33,026.63 |
| **2010** | $20,016.00 (from Imagineering) | $13,760.63 |
| **2011** | $30,183.00 (from Imagineering) | $3,593.63 |

Accordingly, the total amount of back pay owed to Gracia is $52,548.37.

### B. Lost Benefits

### 1. 401(k) Contributions

With regard to lost benefits, Gracia first seeks the value of employer contributions to her 401(k). She avers that when she worked at Sigmatron, she participated in the company's 401(k) plan, receiving a contribution from Sigmatron totaling 1% of her annual wages. Gracia Decl. ¶ 12d. Gracia's new employer did not provide this sort of benefit until 2013. Pl.'s Claim at 4. She therefore seeks lost 401(k) contributions for 2009 through 2012. Gracia claims that Sigmatron's 2008-

contribution was $399.68, so for the four years, she asks for a total of $1,598.72. Gracia Decl. ¶ 12d.

It is a close call on whether Gracia has actually met her burden of "establish[ing] the amount of damages she claims" for this particular benefit. *Hutchison*, 42 F.3d at 1044. Gracia assumes that the full value of the contributions is equivalent to cash in hand when, in reality, 401(k) contributions are not so straightforward: funds placed into a 401(k) benefit from favorable tax-deferred treatment on the condition that the money cannot be distributed before the accountholder reaches retirement age without, generally speaking, incurring an early-withdrawal penalty. *See* Internal Revenue Service, *401(k) Resource Guide– Plan Sponsors–General Distribution Rules*, http://www.irs.gov/Retirement-Plans/Plan-Sponsor/401%28k%29-Resource-Guide-Plan-Sponsors-General-Distribution-Rules (last visited Sep. 10, 2015). By receiving the full contribution amount now (well before retirement age), Gracia therefore would get something of a windfall by avoiding that tax hit. Thus, it is not clear that the lump-sum that Gracia requests is a "correct measure of damages for lost back benefits," which is "the out-of-pocket expense incurred by the plaintiff[.]" *Best v. Shell Oil Co.*, 4 F. Supp. 2d 770, 774 (N.D. Ill. 1998); *but see U.S. E.E.O.C. v. Custom Companies, Inc.*, 2007 WL 734395, at *13 (N.D. Ill. Mar. 8, 2007) (granting $1,638 lost 401(k) contributions without further inquiry into true value). A truly accurate damages-calculation based on 401(k) contributions would incorporate some kind of discount rate (minus the early-withdrawal tax penalty, for instance) taking into

consideration true present value. *Cf. McKnight v. General Motors*, 973 F.2d 1366, 1372 (7th Cir. 1992) (articulating principle, in front pay context, that plaintiff must "provide court with essential data necessary to calculate" an award, including "applicable discount rate").

In any event, because there is a reasonable (if not complete) basis to calculate this particular award—namely, one-percent of Gracia's annual earnings—and Sigmatron does not contest it (indeed, the company would have had to make the same amount as contribution had it not fired Gracia), Def.'s Resp. at 11, the Court will grant an award for the 401(k) contributions. But the calculation of the contribution will be set at one-percent of the same benchmark annual earnings used to calculate back pay ($33,776.63), for an amount of $337.77 for each of calendar years 2009, 2010, 2011, and 2012.[4] That total is $1,351.08.

## 2. Health Insurance

Gracia next requests an award for the difference in health insurance costs between Sigmatron and her current employer, where she now pays more in employee-contributions than she did at Sigmatron. After initially calculating that her costs were now $20.16 greater per week (for an insurance plan that covers herself, her husband, and her young son), Gracia Decl. ¶ 12c, she now puts the figure at $1.25 more per week (apparently estimating the cost for herself only), Gracia Supp. Decl. ¶ 15. Gracia's application for the cost difference is underdeveloped and cannot be approved.

---

[4]Gracia does not explain how she derives her proposed annual-contribution rate of $399.68, which is inconsistent with a one-percent contribution by any measure of her earnings.

As Gracia attests, her weekly payroll deduction for health insurance at Sigmatron, when she was still single, was $33.82. Gracia Decl. ¶ 12c. She married and had her son after her firing from Sigmatron and is now currently included in an insurance plan from her husband's employer, and the plan covers both spouses, with a monthly cost of $53.98. *Id*. Gracia therefore does not compare like with like. She is now part of an insurance plan that covers two individuals, not just herself, which, without knowing more, can be assumed to cost more than a plan for a single person. (And if that is not the case, Gracia, who carries the burden of establishing her damages, has not presented evidence to allow for a meaningful comparison.) Further, Gracia provides no basis to substantiate her new estimate that insurance *for herself* (presumably culling out the cost of her husband in some unexplained way) costs $1.25 more per week. Accordingly, the claim for damages in the form of lost health-insurance benefits is denied.

### 3. Vacation and Personal Days

Finally, Gracia seeks several thousand dollars representing the value of vacation and personal days that she would have been eligible for had she not been fired from Sigmatron, a benefit she does not receive at her current job. Although Sigmatron does not contest Gracia's application for some vacation and personal-day related damages, Def.'s Resp. at 11, Gracia has failed to meet her burden of accurately establishing the amount of such an award.

According to Gracia, "the maximum amount of paid vacation is two weeks" per year at her current job, which she has been eligible for since 2012, having had

only one week during 2011 and no rights to paid leave during 2010. Gracia Decl. ¶ 12a. She states that when she worked at Sigmatron, she had been eligible for three weeks of paid vacation each year and, had she remained, would have become eligible for four annual weeks upon her fifteenth anniversary with the company in July 2015. *Id.* Sigmatron also provided three paid personal days per year whereas Imagineering does not. *Id.* ¶ 12b. Although Gracia is correct that the loss of more generous paid-leave benefits is recoverable in theory, her argument that she be awarded a flat $624 per lost week of vacation and $374.40 per year for personal days (both based on her last rate of pay at Sigmatron) is flawed. *Id.* ¶¶ 12a, b; Pl.'s Claim at 4-5.

The problem is that Gracia assumes that simply tacking on a week or two of Sigmatron pay, depending on the vacation differential for a given year, directly reflects the value of the lost leave, when it does not. Any leave that Gracia took would not have simply been on top of the number of weeks she worked, but *in place of* some of that work. To illustrate, for 2011, when she only had one week of paid leave at Imagineering but would have had three at Sigmatron, Gracia is in essence asking for two weeks of pay from Sigmatron as damages, on top of the 51 weeks of work she presumably put in and the one week of paid leave she received at Imagineering—yet there are, of course, only 52 weeks in a year. To capture the lost benefit of more paid leave, in other words, what Gracia should have done is adjusted her earnings (even if they might be larger on a gross basis) from Imagineering to determine a rate taking into account paid leave—a rate that

reflects the fact that she must work more and with less leave at the new company for comparable remuneration. This would have enabled a true, apples-to-apples comparison of compensation allowing the Court to fashion an award of back pay incorporating the value of lost leave. As it is, for instance, it is not even clear if the 2008 year-to-date earnings reported on Gracia's last 2008 paystub includes a week of paid leave (presumably it does, as Gracia attests that she "took all of the vacation for which [she] was eligible at" Sigmatron, Gracia Decl. ¶ 12a). Thus, in calculating the back-pay award according to the parameters Gracia identified, the Court may have already taken into account to some degree the value of her paid leave.

Gracia also requests the value of lost vacation and personal days (as well as the health insurance differential) on a post-judgment basis, essentially as a form of front pay-related damages, based on a "very conservative projection [of] five years." Pl.'s Claim at 5. This contention is rejected too, not only on Gracia's failure to provide an accurate means of calculation, but on the separate basis that she provides no evidence whatsoever to justify such a future-looking award. She sought to proceed with her claim for equitable damages solely on the basis of documentary submissions, yet has provided no such evidence to indicate how long she would have reasonably expected to remain with Sigmatron—which is indispensable to crafting any future compensation—and certainly nothing to justify a five-year award period.[5] *See McKnight*, 973 F.2d at 1372 (plaintiff must give court basis of information like "the length of time the plaintiff expects to work for the defendant"

---

[5]Gracia herself, in renouncing any claim for reinstatement, noted that returning and remaining at Sigmatron would be undesirable, especially as the manager who was involved centrally in her initial harassment claims still works there. Pl.'s Claim at 2 and n.1.

to support a front-pay award); *see also Bruso v. United Airlines, Inc.*, 239 F.3d 848, 862 (7th Cir. 2001) ("If the plaintiff fails to provide this information to the district court, the court will not abuse its discretion if it denies his request for front pay."). In sum, Gracia's claim for the value of lost vacation and personal-day leave, up to the date of judgment and beyond, is denied as not sufficiently proven.

## C. Prejudgment Interest

Gracia seeks prejudgment interest on her award of back pay and lost 401(k) contributions. There is no doubt that "Title VII authorizes prejudgment interest as part of the backpay remedy in suits against private employers." *Loeffler v. Frank*, 486 U.S. 549, 557 (1988) (noting unanimity of courts of appeal); *see also Shott v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 338 F.3d 736, 745 (7th Cir. 2003) (prejudgment interest presumptively available for violations of federal law). "[P]rejudgment interest typically accrues from the date of the loss or from the date on which the claim accrued," in this case the date of the firing, December 8, 2008 (this date is not contested). *Am. Nat. Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 935 (7th Cir. 2003). Unlike postjudgment interest, however, "there is no statutory rate of prejudgment interest"; determining an applicable rate is left to the district court's discretion based on individual circumstances, although "the best starting point is to award interest at the market rate, which means an average of the prime rate for the years in question." *Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1114 (7th Cir. 1998) (citations omitted).

The market rate is perfectly reasonable here and, as Gracia states (and Sigmatron does not dispute), Pl.'s Claim at 6, the figure to be used for her award is 3.25 percent, as that was the prime rate for almost the whole prejudgment period in this case, except for a few weeks when it was 3.61 percent. *See* Board of Governors, Federal Reserve System, *Historical Data, Selected Interest Rates*, http://www.federalreserve.gov/releases/h15/data.htm (last visited Sep. 10, 2015) (download spreadsheet for "Bank prime loan" at hyperlink for "monthly" data). The prejudgment interest will be compounded monthly. *See Geraty v. Village of Antioch*, 2014 WL 1475574, at *3 (N.D. Ill. Apr. 15, 2014); *see also Am. Nat. Fire Ins. Co.*, 325 F.3d at 938 ("Compound interest generally more fully compensates a plaintiff[.]"). Accordingly, the total prejudgment interest (modified from Gracia's chart, *see* Pl.'s Claim, Exh. C), up to September 2015, is calculated as follows.

| | **2008** | **2009** | **2010** | **2011** | **2012** | **Total** |
|---|---|---|---|---|---|---|
| **Principal (Wages)** | $2,167.48 | $33,026.63 | $13,760.63 | $3,593.63 | N/A | |
| **Principal (401(k))** | N/A | $337.77 | $337.77 | $337.77 | $337.77 | |
| **Total Principal** | $2,167.48 | $33,364.40 | $14,098.40 | $3,931.40 | $337.77 | |
| **Accrued Months** | 81 | 69 | 57 | 45 | 33 | |
| **Rate (compounded monthly)** | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | |
| **Interest** | $530.88 | $6,845.44 | $2,349.99 | $508.83 | $31.53 | $10,266.67 |

The total award of prejudgment interest to Gracia is $10,266.67.

## D. Tax-Component Award

Finally, Gracia asks for a tax-component award to offset the increased tax burden she will incur as a result of receiving a lump sum award in this case of her back pay. The Seventh Circuit, joining other circuits, recently adopted the availability of such an offset in discrimination cases. *E.E.O.C. v. N. Star Hospitality, Inc.*, 777 F.3d 898, 904 (7th Cir. 2015) ("Put simply, without the tax-component award, [a plaintiff] will not be made whole, a result that offends Title VII's remedial scheme."). Here, the Court has determined that Sigmatron owes Gracia $52,548.37 in unpaid back wages from 2008 to 2011; had Gracia received that amount spread out over the 2008 to 2011 period, she would undoubtedly have paid less in taxes than she will now have to, receiving the wages in a lump sum along with the other damages awarded her in this case, when added to her existing income. This extra tax hit is due to the increased marginal taxation as certain income thresholds are crossed.

Gracia attests that had she received the rightful wages in question in the appropriate years (remember her annual pay should have been $33,776.63 during that time), the federal income tax rate applied to her after applying the appropriate standard deduction would have been 15 percent. Gracia Decl. ¶ 14. This contention appears supported by Internal Revenue Service tax-rate schedules for those years. *See* Gracia Decl., Exh. H, I.R.S. Tax Rate Schedules 2008 to 2011 (ceiling for 15-percent bracket ranges from pre-deduction income of $32,550 in 2008 to $34,550 in

2011).[6] Sigmatron does not dispute the underlying tax-offset theory of recovery or that Gracia would have been subject to the 15-percent rate, but it does question to what higher marginal rate her lump-sum recovery in this case will take her, arguing that at most she will fall into the bracket for a 33-percent rate. Def.'s Resp. at 9-10. Gracia believes her recovery could push her income high enough to be taxed at the 39.6-percent rate. Pl.'s Claim at 7. As explained below, the Court's calculation (based on publicly available tax-rate data) shows that her back-pay award will be taxed mostly at a 35-percent rate and partly at a 33-percent rate.

According to Gracia, she and her husband, who will be filing jointly, expect to have an income of about $90,000 in wages for 2015. Gracia Decl. ¶ 13. In addition to that amount, Gracia will have to report as taxable income: $300,000 awarded by the jury in compensatory and punitive damages in this case; the $1,351.08 in lost 401(k) contributions awarded now as equitable relief; the $10,266.67 in prejudgment interest also awarded, as calculated above; and, the $52,548.37 in back pay. Gracia's anticipated income on her 2015 tax-year filing will therefore be $454.166.12. For 2015, a rate of 39.6 percent will apply to married individuals filing together for incomes over $464,850, a 35-percent rate applies to all incomes above $411,500, and a 33-percent rate for income between $230,450 and $411,500. *See* Internal Revenue Service, *Revenue Procedure 2014-61*, available at http://www.irs.gov/pub/irs-drop/rp-14-61.pdf.

---

[6]Sigmatron does not raise any objection to the validity of these attached schedules, which appear to be photocopied from I.R.S. publications.

Had Gracia received her $52,548.37 in back pay appropriately and been taxed at the resulting 15-percent rate, her tax liability on this sum would have been $7,882.26. At 2015 rates, Gracia will be taxed at 35-percent for the first $42,666.12 of her back-pay award (that rate applying to any income over $411,500), and the remaining $9,882.25 at 33 percent (which applies to incomes between $230,500 and $411,500), for a resulting total tax liability at 2015 rates of $18,194.28 on her back pay. Gracia is accordingly entitled to the differential of $10,312.02 as a tax-component award for the back-pay award.

Finally, Gracia also asks for a tax offset to cover any liability for the 401(k)-contribution portion of damages, arguing that these contributions would ordinarily have been tax-deferred. It is true that 401(k) contributions are only taxed upon distribution to the accountholder, typically during that person's retirement. Gracia asks for a tax-component award of 42.75 percent of the 401(k) contributions, approximating this rate as what she "might be taxed at some unknown point decades into the future." Pl.'s Claim at 7. But this request is based on nothing but conjecture, without any supporting detail as to how that was computed. Moreover, as already explained, by receiving the *present* cash value of these contributions, Gracia is already benefitting by having access to money she ordinarily would not have for decades. Gracia's application for a tax-component award for her 401(k) contributions is denied.

### III. Motion for Sanctions

During trial, Sigmatron filed a motion for sanctions under Rule 37(c)(1) against Gracia, alleging that she had displayed for the jury "doctored" versions of some exhibits which had "never" been produced to Sigmatron, intending to obscure the fact that Gracia had forwarded one of the emails to her counsel. Mot. Sanctions at 1-2. The exhibits in question were emails that Gracia's supervisor at Sigmatron had sent her (and sent to others), with sexually-oriented photo attachments; unlike previous versions that had been disclosed and discussed during discovery and up to the pretrial conference, the versions shown by Gracia's counsel during opening statements included the photographs isolated and enlarged, rather than as part of the text of the email, including a visible header with the sender/recipient information. *Id*. at 4. Previous versions of the emails that had been produced during the course of litigation had included both printouts of the original emails in question (with smaller versions of the photographs in the body of the email) along with a separate page with the identical photographs alone. *See* R. 52-54, 56, Pl.s' Exhs. in Opp. Def.'s Mot. Summ. J. For relief, Sigmatron requested that the photo-only exhibits be stricken, the jury be informed of the modification, and Gracia be ordered to pay reasonable attorney's fees caused by the failure to disclose the exact version used at trial. Mot. Sanctions at 9.

Although the Court did admonish Plaintiff's counsel for the improper removal of the headers without warning, the Court noted that, because there was "no substantive difference" in the photographs shown from previously disclosed

versions, and because Sigmatron could cross-examine Gracia about the fact that she had also forwarded the email (as well as introduce as an exhibit the email with the header), Sigmatron would still be free to present to the jury the entire context of the email. *See* R. 189, Trial Tr. at 222-23, 227. Thus, there was no need to strike the exhibits or instruct the jury in some way, although the Court reserved the question of whether monetary sanctions would be appropriate against Gracia's counsel for the failure to notify opposing counsel of modifying previously set trial exhibits at the very last minute. *Id.* at 221.

To be sure, as the Court explained during the trial, this failure was certainly blameworthy. But sanctions are not ultimately warranted. The chief reason is that there was no discernable effect of the selective focus on the photographs; Sigmatron had the opportunity to cross Gracia as explained; and, as it turned out, Gracia lost on her sexual harassment claim anyway, and that was the claim for which the exhibits were primarily introduced. As a result, Sigmatron's motion is denied.

## IV. Conclusion

For the reasons given, Gracia is awarded damages for equitable relief in the amount of: $52,548.37 in back pay, $1,351.08 in lost 401(k) contributions, $10,266.67 in prejudgment interest, and $10,312.02 as a tax-component award, for a total award of $74,478.14. As also explained, Sigmatron's motion for sanctions is denied.

ENTERED:

s/Edmond E. Chang

Honorable Edmond E. Chang
United States District Judge

DATE: September 17, 2015